THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
LARRY SPEARS, Defendant-Appellant.

First District (3rd Division)   No. 85—1689

Opinion filed April 20, 1988.

Steven Clark and Gordon H. Berry, both of State Appellate Defender's Office, of Chicago, for appellant.

Richard M. Daley, State's Attorney, of Chicago (Kenneth T. McCurry, Patricia Y. Brown, Elissa Rhee-lee, and Patrick M. Brady, Assistant State's Attorneys, of counsel), for the People.

JUSTICE FREEMAN delivered the opinion of the court:

Defendant, Larry Spears, was charged by information with deviate sexual assault (Ill. Rev. Stat. 1983, ch. 38, par. 11—3(a)), aggravated battery (Ill. Rev. Stat. 1983, ch. 38, par. 12—4(b)(1)), indecent liberties with a child (Ill. Rev. Stat. 1983, ch. 38, par. 11—4(a)(2)), and unlawful restraint (Ill. Rev. Stat. 1983, ch. 38, par. 10—3(a)). After a jury trial defendant was convicted on all counts. The trial court sentenced defendant to concurrent terms of imprisonment of 30 years for deviate sexual assault and five years for aggravated battery.

Defendant appeals and raises the following contentions: (1) reasonable doubt exists regarding whether defendant was the assailant, where improper and inconclusive identification evidence was relied on to convict him; (2) the prosecution denied defendant a fair trial where it introduced the hearsay testimony of a police officer regarding the contents of a conversation with an unidentified citizen; (3) defendant was denied due process where the complainant's lineup identification was the product of an impermissibly suggestive photographic identification; (4) defendant was denied his right to be present at every critical stage of the proceedings where the trial court examined jurors in groups of 12 instead of four and retired to chambers, with only attorneys present, to allow for the exercise of peremptory challenges off the record; and (5) the trial court erred in basing defendant's 30-year sentence on considerations of revenge and "evening the score."

For the reasons stated below, we affirm the judgment of the circuit court.

The evidence at trial indicated the following. The 15-year-old complainant testified that around 7:15 a.m. on November 3, 1983, she left her grandmother's house in Chicago to go to school. She walked on

the sidewalk along 100th Place near Vincennes Avenue. As she walked, she noticed a man walking ahead of her. He walked up the hill of a railroad crossing, crossed the tracks, and disappeared down the other side of the hill. Complainant then approached and crossed the same hill and tracks and continued walking until she passed a church. She noticed the same man standing in an alley just past the church. She continued to walk and approached the part of the sidewalk that abuts the mouth of the alley, when she saw that the man was watching her. When she came within 10 to 15 feet of him he was still watching her, and he mumbled something to her. She looked at him, became nervous, and then looked away. Complainant did not answer him but continued to walk.

She walked past two intersections and then past another church. There was an alley just past this second church. As complainant passed the alley, she heard hard-heeled footsteps running behind her. She turned around and saw that it was the same man she had seen before. The man grabbed her around the neck, put a gun to her head, and told her that he knew "a nice garage" where he would take her. Complainant testified that as or before the man grabbed her she saw the left side of his face at a distance of one foot. The man led her down the nearby alley. Complainant testified that she looked again at his face and saw the entire left side of his face. Complainant was walking next to or slightly ahead of the man.

Complainant told the man that if he left her alone her parents would give him money. The man continued to hold one arm around complainant's neck. With his other hand he held the gun to her head. The man walked complainant about three-quarters of a block down the alley until they approached a garage. The overhead garage door was broken and was lying on the ground. There was no car in the garage. Complainant noticed garbage and glass inside. In one of the far corners of the garage there was a door panel propped up near the wall. The man pushed complainant into the garage. She turned around, putting her back towards the wall, and looked at the man. He was standing directly in front of her, about a foot away.

Complainant testified that the garage was dark and she was not able to see well at first. After 10 to 15 seconds, her eyes adjusted to the relative darkness of the garage. The man held the gun near his side pointing toward complainant's stomach. He told complainant to take off her pants but she refused. Complainant stooped down and began to cry, and the man grabbed her by the arm and pulled her up.

After a short time, he told her to turn around to face the wall of the garage, which complainant did. She turned back around, however,

and told him, "No way." The man then ordered her to get down on her knees and perform oral copulation on him. When she refused, he hit her on the head with the butt of his gun. He then forced complainant to perform oral copulation on him as he held the gun between her eyes. After two to three minutes, complainant heard a man's voice coming from outside the garage. The assailant jumped back, began to zip up his pants, and went to talk to the man who approached. Complainant was not able to see the man who arrived at the garage, as she was behind the propped door. After the two men had a brief conversation, the second man left. The assailant then left the garage and ran into a yard. Complainant testified that she was in the garage with the assailant for approximately five to eight minutes. Complainant went to a gas station for help and the police were called.

Neil Dakak, manager of a gas station and convenience store located at 99th and Vincennes Avenue, testified that complainant came into the store around 7:30 or 8 a.m. on November 3, 1983. She was crying and told Dakak that someone had held a gun on her and tried to rape her. Dakak then called the police, who arrived in 5 to 10 minutes. Dakak also testified that he knew defendant, since defendant used to work for him at the gas station on days when Dakak needed another person to help pump gas. On the date of the subject incident, defendant did not work at the gas station, and Dakak did not see defendant at all on that day. Dakak further testified that defendant's mother and brother came into the gas station on the date of the subject incident. Dakak asked defendant's mother whether she had seen defendant. The mother responded that she had not.

James Gorman, a Chicago police officer, testified that around 10 p.m. on November 3, 1983, he and his partner received an assignment over the telephone to meet Sergeant Ross, who was supervising a canvass of the area around 99th and Vincennes in relation to a reported rape. After Gorman and his partner began to canvass the area, they learned that Ross had stopped a citizen who was walking on 111th Street. Ross gave the citizen the description of the offender which the police had received from complainant. The citizen told the officers that he thought defendant was the person for whom they were looking. The citizen gave the officers defendant's name and address. The citizen refused to give his own name to the police.

Elbert Hines testified that he lived at 9951 South Vincennes Avenue. On November 3, 1983, at around 7 a.m., he was walking his dog down the alley behind his home as he does every morning. He saw a man and a girl in the alley between Vincennes Avenue and Throop Street around 7:15 to 7:20 a.m. Hines walked his dog into a vacant lot

along the alley and then saw the man and girl and a dog walk down the alley past the vacant lot. He saw the backs of the man and girl as they walked by. He noticed that the man was black and the girl was white, and that the girl was wearing a jacket with the name Morgan Park High School on the back. The man was holding the girl by the arm. Hines was not able to see their faces.

On the way back to his house with his dog, Hines noticed that the dog which had been with the man and girl was standing in the alley alone, looking into an abandoned garage. Hines brought his own dog home and then returned to the vacant garage, which was a short distance away. He approached the garage and saw a man inside backing away from the corner of the garage. The man's pants were open and his penis was exposed. As the man turned, Hines noticed that the man was holding a gun in his hand. The man said to Hines, "What's happening?" Hines stood there for several seconds without responding, and then turned and ran home to call the police. Hines stated that he was looking into the garage for 10 to 15 seconds. Hines stated that the man had a dark complexion and a "Jheri curl" hairstyle, was wearing a dark jacket and blue trousers, and was approximately 25 to 28 years old. Hines testified at trial that defendant was not the man he saw in the garage.

Hazel Spears, defendant's mother, testified that between 7 and 8 a.m. on November 3, 1983, defendant was at home. She stated that at 7:15 a.m., defendant was in bed sleeping. Aaron Spears, defendant's brother, testified that he arrived at his mother's house around 8:15 to 8:30 a.m. on November 3, 1983. Both his mother and defendant were in the house at that time.

Prior to trial, a hearing was held on the motion to suppress complainant's identification of defendant and the following evidence was adduced. At around 11 p.m. on November 3, 1983, complainant arrived at the police station in order to view a lineup. Officer Gorman testified that complainant had two different viewings of the same five-man lineup. After the first viewing, complainant pointed to defendant and stated that defendant looked "very much like" the man that raped her. Gorman asked complainant what would help her to identify the person. She responded that it would help her if she could hear the persons speak. Gorman and complainant then left the viewing room. Complainant went into an interview room, and Gorman went into another room. Shortly thereafter, Gorman and complainant returned to the viewing room. Each of the persons in the lineup was asked to make a statement. Complainant then positively identified defendant. Gorman further testified that he had taken a Polaroid pho-

tograph of defendant at the police station before the lineup was held. Gorman stated that he was not the officer who was present in the interview room with complainant and her parents when complainant saw the photograph.

Complainant testified that during the first viewing of the lineup she stated that defendant "looked very much like" the man who attacked her. She testified that she "was not absolutely positive, deadly positive" and requested a second viewing. After the initial viewing, she went into an interview room where her parents and a detective were present. While they were in the room, the detective was looking through a folder when a photograph fell from the folder onto the floor. The photograph fell just beneath complainant. Complainant recognized defendant as the person depicted in the photograph. Complainant stated that the photograph immediately was snatched up by the detective. Complainant then went to view the lineup for the second time. After the men in the lineup were to make a statement, complainant positively identified defendant.

At trial, complainant stated that the lighting in the photograph that fell to the floor was more like the lighting in the garage when she viewed the offender's face than the lighting at the lineup. She stated that the lighting at the lineup was bright and made defendant's face look lighter. Complainant stated that when she heard defendant's voice during the second viewing of the lineup, she was positive that he was the offender.

On appeal, defendant initially asserts that reasonable doubt existed whether he was the assailant. Defendant asserts that a reliable witness, Elbert Hines, denied that defendant was the assailant. Further, defendant contends that complainant's ability to view the assailant was hampered, and her identification testimony was prompted by the improper single-photo identification procedure.

■ A conviction will not be overturned unless the State's evidence was so unreasonable, improbable, or unsatisfactory as to raise a reasonable doubt regarding the defendant's guilt. (*People v. Collins* (1985), 106 Ill. 2d 237, 261, 478 N.E.2d 267, *cert. denied* (1985), 474 U.S. 935, 88 L. Ed. 2d 274, 106 S. Ct. 267, *reh'g denied* (1985), 474 U.S. 1027, 88 L. Ed. 2d 567, 106 S. Ct. 585.) Further, it is well established that a positive identification by one witness with ample opportunity to observe is enough to convict a defendant. (*People v. Escobar* (1979), 77 Ill. App. 3d 169, 175, 395 N.E.2d 1028.) The focus of any case involving an identification is the extent of the witness' opportunity to form an independent impression of the offender at the scene of the crime. Where the circumstances do not afford a favorable op-

portunity for positive identification, that evidence may not be sufficient to sustain guilt beyond a reasonable doubt where defendant has presented a plausible alibi. *People v. Smith* (1977), 52 Ill. App. 3d 583, 588, 367 N.E.2d 756, *cert. denied* (1978), 436 U.S. 961, 57 L. Ed. 2d 1127, 98 S. Ct. 3079.

■ In the instant case the record reveals that complainant observed "the whole left side" of defendant's face two or three times at a distance of one foot while walking down the alley and another time when he first came up behind her. It was daytime, and complainant stated that while the sky was cloudy, there was no rain or snow and she could see well. Complainant observed defendant for an additional three to four minutes within a very short distance while they were in the garage. The garage was illuminated by daylight shining through the overhead door opening. Complainant stated that although the lighting in the garage was dimmer than outside, her eyes adjusted to the relatively dim light. This evidence indicates that complainant had a sufficient opportunity to observe defendant in order to make a positive identification.

Additionally, complainant gave police a detailed, accurate description of defendant just after the crime occurred. She described the offender as a black male, 30 to 35 years old, 5 feet 10 inches tall, weighing 140 pounds, with a short "afro," and wearing a faded blue jeans jacket and dark pants. The evidence at trial revealed that defendant was 5 feet 7 or 5 feet 8 inches tall, weighed 135 to 140 pounds, and was 32 years old on the date of the subject incident. The accuracy of complainant's description of defendant as the offender further indicates that she had a sufficient opportunity to view him.

Further, although proof of an alibi was offered by the defense, the determination of the issues of identification and credibility was within the province of the jury. (*People v. Holloway* (1985), 131 Ill. App. 3d 290, 475 N.E.2d 915.) We cannot find that the jury's decisions regarding these matters were so unreasonable, improbable, or unsatisfactory as to be disturbed by this court on appeal. *People v. Smith* (1977), 52 Ill. App. 3d 583, 588, 367 N.E.2d 756, *cert. denied* (1978), 436 U.S. 961, 57 L. Ed. 2d 1127, 98 S. Ct. 3079.

■ Defendant next asserts on appeal that the prosecution denied him a fair trial by introducing hearsay evidence through Officer Gorman, who disclosed the substance of a conversation with an unidentified citizen. Specifically, Gorman testified that during the investigation of the reported rape, the citizen told police, "I think the one you are looking for is Larry Spears." Defendant asserts that the admission of this testimony constitutes prejudicial and reversible error enti-

tling him to a new trial.

Defendant failed to object at trial to the admission of this evidence. Further, defendant failed to make a specific objection to the admission of this testimony in his post-trial motion. Therefore, defendant has waived this issue on appeal. (*People v. Pallardy* (1981), 93 Ill. App. 3d 725, 417 N.E.2d 851.) Even assuming, however, that the issue is reviewable, we find no reversible error.

■■ When a police officer testifies that he had a conversation with an individual and that he subsequently acted thereon, without revealing the substance of the conversation, such testimony is based on the officer's personal knowledge and is competent to show the officer's investigatory procedure. (*People v. White* (1985), 134 Ill. App. 3d 262, 282, 479 N.E.2d 1121, *cert. denied* (1986), 475 U.S. 1126, 90 L. Ed. 2d 194, 106 S. Ct. 1650.) When the testimony proceeds beyond the facts based on the officer's personal knowledge, it becomes inadmissible hearsay. *People v. White*, 134 Ill. App. 3d at 282.

■■ In the instant case, Officer Gorman's testimony that he had a conversation with the unidentified citizen during the course of the police investigation of the reported rape was properly admitted. It was error, however, for the court to admit Gorman's testimony as to the substance of his conversation with the unidentified citizen. Gorman's testimony indicating the specific statements of the citizen was inadmissible hearsay. *People v. White*, 134 Ill. App. 3d at 282.

However, we find that the error committed in admitting the testimony was harmless. The admission of hearsay evidence is harmless error where there is no reasonable probability that the jury would have acquitted the defendant if the hearsay evidence had been excluded. (*People v. Griggs* (1982), 104 Ill. App. 3d 527, 432 N.E.2d 1176.) We find no reasonable probability in the instant case that the jury would have acquitted defendant even absent the improper testimony of Officer Gorman. The record indicates that there was sufficient competent evidence to convict defendant.

For instance, the testimony of complainant was detailed and credible. Further, the alibi testimony of Hazel Spears, defendant's mother, was impeached. Hazel Spears testified that defendant was in her house between 7 and 8 a.m. on November 3, 1983, but she could not recall exactly where he was in the house during the entire time. Hazel Spears testified that she, defendant, and her other son, Aaron, ate breakfast together at 8 a.m. on the date of the incident.

Aaron Spears, defendant's brother, however, testified that he arrived at his mother's house no earlier than 8:15 or 8:30 a.m. that day. Aaron Spears verified that time, as he had a computer printout sheet

from a State office that he had visited that morning. The printout sheet indicated the time he received the printout to be 7:36 a.m. on November 3, 1983. The State office where he obtained the printout was located at 113th and Halsted Street. Aaron stated that after receiving the printout sheet, he left the office and took public transportation on Halsted Street to 95th Street and transferred buses to travel along 95th Street to 95th and Ashland Avenue. He stopped at the Jewel Food Store at 95th and Ashland to buy a "few things," and then walked to his mother's house at 99th and Winston. Aaron stated that he arrived at his mother's house around 8:15 or 8:30 a.m. When he arrived at the house, defendant was in bed. Around 10 minutes after Aaron arrived, defendant got up and defendant, Aaron, and their mother ate breakfast together. Aaron stated that they had breakfast around 8:30 to 8:45 a.m.

Aaron Spears' testimony was credible and clear. The computer printout sheet, which was made an exhibit at trial, supported Aaron Spears' testimony that he, defendant, and their mother had breakfast together on November 3, 1983, at around 8:30 to 8:45 a.m. Hazel Spears' testimony that the three of them had breakfast at 8 a.m. therefore was impeached.

Further, the record indicates that the offense occurred around 7:15 to 7:30 a.m. in an alley approximately one to two blocks away from the house where defendant lived with his mother. Defendant testified that he was asleep on the morning of the incident until around 8:30 a.m. The jury, however, may reasonably have found that the testimony of defendant and his mother was not credible regarding where defendant was at the time of the subject incident, around 7:15 to 7:30 a.m. The jury, therefore, could reasonably have concluded that it was possible that defendant was not in his mother's house at that time.

In addition, the testimony of Elbert Hines, who stated that defendant was not the offender, was impeached. For instance, Hines stated that he was "sure that the girl was taller" than the man. Defendant indicated to police, however, that he was 5 feet 8 inches tall. Complainant stated that, at the time of trial, she was 5 feet 6 inches tall. The record indicates that she was 5 feet 4 at the time of the incident. The evidence thus indicates that defendant was four inches taller than complainant when the incident occurred, and Hines' testimony that the girl was taller than defendant was impeached. Further, the time during which Hines could have observed the offender's face was very short, some 10 to 15 seconds, under lighting in the garage that was relatively dim. Therefore, the jury could reasonably have believed that Hines' opportunity to view the offender was poor.

In view of the foregoing, we find that the evidence offered to exculpate defendant was impeached, while the testimony of the victim was detailed and credible. We find no reasonable probability that the jury would have acquitted defendant even absent the admission of the hearsay testimony. Therefore, the admission of Gorman's testimony regarding the content of his conversation with the unidentified citizen was harmless error. *People v. Griggs* (1982), 104 Ill. App. 3d 527, 432 N.E.2d 1176.

■ Defendant also contends that he was denied due process of law by the admission of the victim's lineup identification, since the identification was the product of an impermissibly suggestive single-photo identification. Further, defendant asserts, the corrupting effect of the lineup identification extended to complainant's in-court identification, which also should be suppressed. Defendant also asserts that complainant's testimony is contradictory in that she stated at trial that the photograph "fell" onto the floor in the police station, while her testimony at the preliminary hearing indicated that she "was shown" the photograph by police. Defendant further asserts that the presence of the detective and the teenage complainant's parents in the interview room where complainant saw the photograph, and the ordeal complainant had suffered that day, pressured her into making an identification.

We do not believe that complainant's lineup identification was the improper product of a suggestive single-photo identification. The record shows a sufficient basis for an identification wholly independent of the viewing of the photograph. (*Manson v. Braithwaite* (1977), 423 U.S. 98, 53 L. Ed. 2d 140, 97 S. Ct. 2243; *People v. Moore* (1972), 51 Ill. 2d 79, 281 N.E.2d 294, *cert. denied* (1972), 409 U.S. 979, 34 L. Ed. 2d 242, 93 S. Ct. 331.) Complainant stated during the initial viewing of the lineup that defendant looked "very much like" the man who attacked her. The record indicates that she requested a second viewing so that she could be absolutely sure about the identification. During the second viewing, each of the men in the lineup was asked, at the request of complainant, to state, "Pull down your pants. Shut up or I'll kill you." After hearing each man speak, complainant positively identified defendant.

Defendant asserts that complainant hesitated in identifying defendant at the first police lineup for the reason that she was uncertain defendant was one of her assailants. The record indicates, however, that complainant believed, even during the first showing of the lineup, that defendant was the offender. The "hesitation" by complainant was explained through her testimony at trial. Complainant

testified that the lighting at the lineup was different than the lighting under which she observed defendant on the day of the offense. She stated that the lighting in the garage was dimmer than the lighting at the lineup.

Complainant admitted at the preliminary hearing that seeing the photograph helped her to identify defendant, since the lighting in the photograph was similar to the lighting in the garage. We do not find, however, that her viewing of the photograph was so overly suggestive as to result in the probability of misidentification. Complainant stated during the initial viewing that defendant "looked very much like" the man who assaulted her. Complainant positively identified defendant during the second viewing of the lineup after he made the statements, "Pull down your pants. Shut up or I'll kill you."

The totality of circumstances indicates that there was no due process violation as a result of complainant's viewing of the photograph. (*Manson v. Braithwaite* (1977), 432 U.S. 98, 53 L. Ed 2d 140, 97 S. Ct. 2243.) Complainant had a high degree of attention at the time of the occurrence. She provided an accurate description of the offender to police and was able to identify defendant during an initial lineup as a man who "looked very much like" the offender. Then, she positively identified defendant after hearing him speak during a second showing of the lineup. Further, we find that there was no "corrupting effect" on the in-court identification and that the in-court identification was proper. See *People v. Manion* (1977), 67 Ill. 2d 564, 572, 367 N.E.2d 1313, *cert. denied* (1978), 435 U.S. 937, 55 L. Ed. 533, 98 S. Ct. 1513, citing *Manson v. Braithwaite* (1977), 432 U.S. 98, 53 L. Ed. 2d 140, 97 S. Ct. 2243.

■ In addition, we do not believe that the presence, in itself, of complainant's parents and the officer in the interview room would increase the probability that complainant would feel obligated to make an identification or would misidentify the offender. There was no evidence presented at trial to indicate that her parents or the officer pressured complainant into making an identification. Even assuming *arguendo* that there was some pressure or any suggestiveness from the presence of complainant's parents or the officer or from the incident she had experienced that day, we believe that the identification otherwise had a sufficiently reliable basis. *People v. Manion* (1977), 67 Ill. 2d 564, 571, 367 N.E.2d 1313, *cert. denied* (1978), 435 U.S. 937, 55 L. Ed. 2d 533, 98 S. Ct. 1513.

■ Additionally, we address defendant's assertion that complainant testified at a preliminary hearing that she "was shown" a picture from a folder, while at a subsequent hearing and at trial, complainant

stated that the photograph "fell" from the folder. Complainant's trial testimony explained the discrepancy. At trial complainant stated that at the preliminary hearing, she was responding to a question regarding how many photographs she "was shown" by the police. She responded that she was shown only one. At trial she explained that she was nervous at the preliminary hearing and did not have the chance to explain that in fact the photograph had "fallen" or "slipped out" of the folder and immediately was picked up by the officer. The determination of complainant's credibility was for the jury. (*People v. Holiday* (1985), 130 Ill. App. 3d 753, 474 N.E.2d 1280.) As we do not find that determination to be unreasonable, we will not disturb the decision on appeal. *People v. Holiday*, 130 Ill. App. 3d at 756.

■ Defendant also contends that the trial court examined prospective jurors in groups of 12 instead of in panels of four, thus lending the parties more than the usual number of decisions to make in exercising peremptory challenges and complicating such decisions. Defendant asserts that the trial court's procedure made it more likely that discriminatory jury selection procedures were utilized. Defendant also asserts that the trial court retired to chambers with counsel, outside the presence of defendant, to allow for the exercise of peremptory challenges. These two procedures by the trial court, defendant asserts, denied him his constitutional right to be present at every critical stage of the trial proceedings.

A criminal defendant has a right to be personally present at every stage of the proceedings against him. (*People v. Lewis* (1979), 73 Ill. App. 3d 361, 368, 386 N.E.2d 910.) Further, a defendant's right to be present can be waived only by defendant himself. *People v. Davis* (1968), 39 Ill. 2d 325, 235 N.E.2d 634.

In the instant case, defendant failed to object at trial to this issue. Defendant did, however, raise this issue in his post-trial motion and we consider the issue on appeal. The record indicates that prospective jurors were examined by the trial judge in open court in the presence of counsel, defendant, and the court reporter. However, several times during *voir dire* examination, after questioning several prospective jurors, the court requested a sidebar or took a brief recess, after which the court announced that certain prospective jurors were excused. It is defendant's apparent absence during the sidebar and recess that defendant objects to in this appeal.

The record indicates that at the hearing on defendant's post-trial motion, defendant's trial counsel was questioned by the court regarding the jury selection procedure and communication with defendant. Defense counsel indicated that before proceeding into chambers, she

and counsel for the prosecution, in the presence of defendant, discussed the prospective jurors. Defense counsel stated that she recalled at least one particular instance where defendant expressed his views toward a particular juror, commenting that he liked the juror since the juror subscribed to a Christian magazine. Defense counsel stated that she remembered asking defendant several other times whether he had any comments regarding any other prospective juror. Defense counsel stated that she had informed defendant even prior to trial regarding *voir dire* questioning, and explained to him that both the prosecution and defense would be able to excuse some jurors.

There is no indication in the record that defendant was precluded from making suggestions to defense counsel during the court's questioning of the prospective jurors, or later during the discussions among defense counsel, the prosecutor, and defendant regarding specific objections to prospective jurors. We find that the communication by defense counsel to the court of the defense's specific objections regarding prospective jurors is not a critical stage of trial requiring defendant's presence. (See *People v. Pierce* (1974), 56 Ill. 2d 361, 308 N.E.2d 577.) Further, the record in the instant case fails to indicate that defendant's interests or substantial rights were violated or that he was prejudiced in any way by his absence during the communications between the trial court and counsel regarding prospective jurors. (*People v. Pierce*, 56 Ill. 2d at 363.) Rather, the record shows that defendant was able to communicate with counsel during jury selection and that defendant's comments were carefully considered by defense counsel and communicated to the court.

We note that under different circumstances, such as where a defendant was unable to communicate to counsel or the court his comments regarding prospective jurors, the defendant's right to be present at a critical stage of trial would be violated. Such a procedure would result in reversible error entitling the defendant to a new trial. In the instant case, however, defendant's right to be present was protected.

■■ Finally, defendant contends that the trial court erred in basing his 30-year sentence on considerations of revenge and "evening the score." Defendant asserts that the trial court violated the spirit of the sentencing provision of the Illinois Constitution by focusing only on the seriousness of the crimes and abused its discretion by failing to look to mitigating factors.

The Illinois Constitution provides that "[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." (Ill.

Const. 1970, art. I, §11.) The trial court is therefore charged with the responsibility of pronouncing a sentence that will protect the interest of society, as well as allow for the possible rehabilitation of the offender. *People v. Perruquet* (1977), 68 Ill. 2d 149, 155, 368 N.E.2d 882.

A court of review will not set aside a sentence upon a claim of error unless the defendant can show some actual prejudice from the error complained of. (*People v. Silagy* (1984), 101 Ill. 2d 147, 182, 461 N.E.2d 415, *cert. denied* (1984), 469 U.S. 873, 83 L. Ed. 2d 156, 105 S. Ct. 227, *reh'g denied* (1984), 469 U.S. 1067, 83 L. Ed. 2d 439, 105 S. Ct. 552; see also *People v. Collins* (1985), 106 Ill. 2d 237, 478 N.E.2d 267, 286, *cert. denied* (1985), 474 U.S. 935, 88 L. Ed. 2d 274, 106 S. Ct. 267, *reh'g denied* (1985), 474 U.S. 1027, 88 L. Ed. 2d 567, 106 S. Ct. 585.) Further, when a trial court imposes a sentence that is within the statutory limit, it will not be altered upon review absent an abuse of discretion by the trial court. (*People v. Perruquet*, 68 Ill. 2d at 155.) Further, "[t]he weight to be accorded the various factors in aggravation and mitigation *** depends on the facts and circumstances of each case, and the balance struck by the trial judge will not be disturbed if there is support in the record for his determination." *People v. Piontkowski* (1979), 77 Ill. App. 3d 994, 996, 397 N.E.2d 36.

■■■ The record in the instant case indicates that the trial judge stated that the crime committed by defendant "calls upon me to even up the score." The court went on to say, "I'll even up the score. I'll take a good part of your life. You took her life; I'll take a good part of your life." The record also reveals, however, that the trial judge questioned defendant at the sentencing hearing regarding his family, work experience, health, and prior criminal record and arrests. Defense counsel presented factors in mitigation, including that defendant had only one prior conviction, for possession of a controlled substance; that there were no brutal physical injuries inflicted during the commission of the subject offense; that there was no wanton cruelty committed by defendant during the subject offense; and that defendant had high potential for rehabilitation.

The record indicates that the trial court properly considered these aggravating and mitigating factors in arriving at the 30-year sentence. In its discretion the trial court emphasized the heinous nature of the crime, the adverse impact of the offense on society, and the potential danger defendant poses to the community. Further, the sentence is within the statutory range of 6 to 30 years for the class "X" felony of deviate sexual assault (Ill. Rev. Stat. 1983, ch. 38, pars. 11—3(b), 1005—8—1(3)). For these reasons, we find no abuse of discretion

by the trial court. (*People v. Perruquet* (1977), 68 Ill. 2d 149, 368 N.E.2d 882.) Further, the sentence is not unauthorized by law or excessive since the court considered defendant's rehabilitative potential in addition to the heinous nature of the crime and the circumstances under which it was committed. *People v. Heflin* (1978), 71 Ill. 2d 525, 545-46, 376 N.E.2d 1367, *cert. denied* (1979), 439 U.S. 1074, 59 L. Ed. 2d 41, 99 S. Ct. 848.

We do find, however, that the comments by the trial judge regarding "evening the score" and the "taking" of defendant's life were highly improper and inappropriate and constituted error by the court. We find, however, that the error committed was harmless. The record indicates that the court considered all relevant factors in imposing the sentence. Further, defendant failed to indicate that he suffered any prejudice as a result of the trial court's improper comments. *People v. Collins* (1985), 106 Ill. 2d 237, 478 N.E.2d 267, *cert. denied* (1985), 474 U.S. 935, 88 L. Ed. 2d 274, 106 S. Ct. 267.

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Judgment affirmed.

WHITE, P.J., and McNAMARA, J., concur.