THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. BRADLEY K. GENTRY, Defendant-Appellant.

Fourth District    No. 4—02—0890

Argued June 23, 2004.—Opinion filed August 24, 2004.

Michael J. Pelletier and Paul Rathburn (argued), both of State Appellate Defender's Office, of Chicago, for appellant.

C. Steve Ferguson, State's Attorney, of Charleston (Norbert J. Goetten, Robert J. Biderman, and Charles F. Mansfield (argued), all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE APPLETON delivered the opinion of the court:

A jury found defendant, Bradley K. Gentry, guilty of manufacturing 400 grams or more of methamphetamine solution (720 ILCS 570/401(a)(6.5)(C) (West 2000)) and possessing a methamphetamine-manufacturing chemical, pseudoephedrine (720 ILCS 570/401(a)(6.6)(A) (West 2000)). The trial court sentenced him to concurrent terms of 15 and 8 years' imprisonment.

Defendant appeals on the following grounds. First, the trial court denied his right to due process by failing to hold a fitness hearing after scheduling one. Second, the State failed to prove the methamphet-

amine solution he manufactured weighed 400 grams or more. Third, the court denied him due process and failed to honor Rule 412 (188 Ill. 2d R. 412) by declining to dismiss the manufacturing count as a sanction for the State's loss or destruction of evidence. Fourth, the court abused its discretion in denying his repeated motions for mistrial. Fifth, his trial counsel rendered ineffective assistance by failing to question the potential jurors more thoroughly about their ability to remain impartial after learning of his prior arrest. Sixth, he was denied his constitutional right to be present during *voir dire*.

We disagree with all those contentions except the second one. Because no one weighed the methamphetamine solution other than a 39.4-gram sample, the State failed to prove defendant manufactured more than 39.4 grams. Therefore, we remand this case with directions to reduce the conviction on count I of the information to the manufacture of 39.4 grams of methamphetamine solution, as opposed to 400 grams or more, and to resentence defendant accordingly (720 ILCS 570/401(a)(6.5)(A) (West 2000)).

## I. BACKGROUND

### A. The Information

On March 30, 2001, the State filed a four-count information against defendant, accusing him of committing drug offenses in Coles County on March 19, 2001. Count I charged him with manufacturing "400 grams or more but less than 900 grams of a substance containing methamphetamine" (720 ILCS 570/401(a)(6.5)(C) (West 2000)). Count II charged him with possessing the same amount (720 ILCS 570/402(a)(6.5)(C) (West 2000)). Count III charged him with possessing pseudoephedrine "with intent to manufacture 30 grams or more but less than 150 grams of any substance containing methamphetamine." 720 ILCS 570/401(a)(6.6)(A) (West 2000). Count IV repeated count III except it alleged an intent to manufacture a lesser amount: "15 grams or more but less than 30 grams" (720 ILCS 570/401(c—5) (West 2000)).

### B. Defendant's Discovery Request

On April 20, 2001, defense counsel personally served a motion for disclosure upon the State. The motion requested any "photographs[ ] or tangible objects" the prosecutor intended to use at trial "or which were obtained from or belonged to the accused" as well as "[a]ny material *** within the State's possession or control [that tended] to negate [defendant's] guilt *** [or] reduce his punishment." On May 7, 2001, the prosecutor told the trial court he had provided defense counsel "with copies of all the discovery."

## C. Fitness To Stand Trial

On July 31, 2001, over defendant's objection, defense counsel filed a motion for an examination of defendant to assess his fitness to stand trial. In response, the prosecutor told the trial court: "Based on not only my conversations with [defendant's current and previous attorneys] but also on what I know about this defendant, I think that this is a *bona fide* request. I have no objection to this defendant['s] being examined." The court granted the motion and appointed a psychologist, Dr. Jerry L. Boyd, to examine defendant.

Boyd examined defendant on August 3, 2001, and in his written report, opined that defendant "had adequate ability to cooperate in his defense" and that he was "[f]it to [s]tand [t]rial."

The parties appeared in the trial court on August 27, 2001, and the prosecutor informed the court that Boyd had found defendant fit for trial. With the agreement of the parties, the court nevertheless scheduled a fitness hearing for September 4, 2001. The parties told the court they anticipated presenting no evidence at the hearing other than Boyd's report.

On September 4, 2001, the prosecutor, defense counsel, and defendant appeared, and the trial court asked the attorneys: "What can I address?" The prosecutor replied: "Judge, at this point, I think all we need is a trial date." Defense counsel did not disagree, and until this appeal, neither party ever again mentioned the need for a fitness hearing. Nor did the court make any express finding on the issue of fitness.

## D. Jury Selection

During jury selection, a potential juror, Lawrence Hodges, stated, within the hearing of the venire, that he used to be a Mattoon police officer. "I don't remember [defendant's] name," he said, "but I was with an officer[,] and we've arrested [defendant] before." Defense counsel moved for a mistrial because of what Hodges said. The trial court denied the motion but excused Hodges for cause.

Another potential juror, Tony Shellaburger, told the trial court that after hearing Hodges allude to the prior arrest, he "[k]ind of" had "reservations" about his ability to "be fair to both sides." The court denied defendant's renewed motion for a mistrial but also excused Shellaburger for cause.

Another potential juror, Janice McMorris, told the trial court that she and her husband worked for State Farm Insurance Company. "We may have Steve Becker's insurance," she said, "but I don't know him well enough that—that it would affect me." Becker was a State witness who testified pursuant to a plea agreement. According to Beck-

er's testimony at trial, defendant accompanied him when he stole anhydrous ammonia from a local fertilizer company. Becker also identified defendant as the owner of a bicycle parked at 1308 Moultrie Avenue, Mattoon, the site of the methamphetamine laboratory. The bicycle had a pouch containing lithium and crushed pseudoephedrine pills—materials for making methamphetamine. Defense counsel accepted a panel that included McMorris, and she was sworn as a juror.

Although defendant was present during the actual questioning of venire members, he did not attend two *in camera* meetings or approach the bench for a sidebar conference, in which the attorneys and trial court discussed challenges for cause, peremptory strikes, and the motions for mistrial.

### E. Evidence at Trial

On March 19, 2001, the police noticed the garage at 1308 Moultrie Avenue reeked of anhydrous ammonia and ether. Inside the garage, they found two transparent quart jars containing a liquid solution; three "punched" cans of starting fluid; and a gallon can of camping fuel, partially full. The solution field-tested positive for anhydrous ammonia and methamphetamine. The police collected approximately 25 milliliters of solution from each jar and sent it to the crime laboratory, which confirmed the presence of methamphetamine by more thorough chemical testing. The laboratory also found organic solvent in the samples.

Because the East Central Illinois Drug Task Force (Task Force) owned no scale in March 2001, no one actually weighed all of the solution in the jars. After the police collected the two 25-milliliter samples, a hazardous-waste disposal company came to the site, removed the jars of remaining solution, and destroyed them. The solution was highly inflammable, and its fumes were toxic; therefore, handling and storing more than a minuscule amount of it would have been dangerous, according to the person in charge of the evidence vault.

Manufacturers of methamphetamine typically stored the liquid form of their product in quart jars like the ones in this case. Lacking a scale at the time, the Task Force customarily took photographs of the jar with a ruler beside it, and the crime laboratory used the photographs to calculate the volume and weight of the solution. At least one police officer, maybe more, took photographs in this case, but the photographs are lost. Nobody seems to know what happened to them or when they disappeared.

The crime laboratory weighed the two 25-milliliter samples: 19.9 grams and 19.5 grams, a total of 39.4 grams. At trial, three police officers—Jamie Bowersock, Doug Livingston, and Scott Standerfer—

estimated the weight of the remaining solution (which, along with the jars, had been destroyed).

According to Bowersock's report, the jars were half full. He testified that in his experience, a quart jar one-fourth full of methamphetamine solution weighed between 300 and 400 grams, not including the weight of the jar. A quart jar full of solution weighed between 900 and 1,000 grams. The trial court overruled defendant's foundation objection.

Also over defendant's foundation objection, Livingston testified that "[e]ther *** weigh[ed] approximately 21 grams per ounce" and thus, in his estimation, the two half-full jars contained a total of more than 600 grams of liquid.

Standerfer testified that "of [his] own personal knowledge and recollection," "[a]bout half a quart [of solution was] in each jar." A quart consisted of 32 fluid ounces, and according to him, one fluid ounce of diethyl ether weighed 21 grams.

### F. The Verdict and Sentence

The jury found defendant guilty of counts I and IV and not guilty of count III. The jury was hung on count II, and the State dismissed that count. For count I, the trial court sentenced defendant to 15 years' imprisonment; for count IV, 8 years' imprisonment. This appeal followed.

## II. ANALYSIS

### A. Fitness To Stand Trial

One presumes every defendant is fit to stand trial. 725 ILCS 5/104—10 (West 2002). Only if, from an objective point of view, the circumstances raise a "*bona fide* doubt"—that is, "a real, substantial[,] and legitimate doubt" (*People v. Eddmonds*, 143 Ill. 2d 501, 518, 578 N.E.2d 952, 959 (1991))—of the defendant's fitness does the defendant have a right to a fitness hearing. 725 ILCS 5/104—11(a) (West 2002). We ask whether the trial court abused its discretion in finding a *bona fide* doubt or lack of doubt. *People v. Murphy*, 72 Ill. 2d 421, 431, 381 N.E.2d 677, 682 (1978).

Defendant argues "the trial court *ipso facto* determined that a *bona fide* doubt existed as to [his] fitness *when it ordered the evaluation*." (Emphasis added.) We disagree. Because a court can order an examination for the very purpose of determining whether "a bona fide doubt as to *** fitness *** may be raised" (725 ILCS 5/104—11(b) (West 2002)), it must follow that merely ordering such an examination does not necessarily imply a finding of *bona fide* doubt. *People v. Hill*, 345 Ill. App. 3d 620, 626, 803 N.E.2d 138, 144 (2003); *People v. Vernon*, 346 Ill. App. 3d 775, 777-78, 805 N.E.2d 1222, 1225 (2004).

■ In this case, the trial court did more than order an examination; with the agreement of the parties, it scheduled a fitness hearing. We have held that if a court schedules a fitness hearing, due process requires the court to actually hold the fitness hearing, notwithstanding psychological reports finding the defendant to be fit. *In re T.D.W.*, 109 Ill. App. 3d 852, 855, 441 N.E.2d 155, 157 (1982). We now overrule *T.D.W.* To hold a fitness hearing, the court must first hear evidence raising a *bona fide* doubt of the defendant's fitness. *Eddmonds*, 143 Ill. 2d at 518, 578 N.E.2d at 959. Even our deferential standard of review requires some evidence by which a reasonable person could find *bona fide* doubt. See *People v. Illgen*, 145 Ill. 2d 353, 364, 583 N.E.2d 515, 519 (1991). If a court can create a right to a fitness hearing merely by scheduling one, we have effectively dispensed with the requirement of evidence, in violation of *Eddmonds*. Boyd opined defendant was fit, and the record appears to contain no evidence to the contrary. We find no abuse of discretion in omitting a fitness hearing.

## B. Due Process and Rule 412

■ Defendant argues that the destruction of the methamphetamine and loss of the photographs, without any resulting sanction by the trial court, violated his right to due process. We disagree.

The State violates due process if it loses or destroys evidence having an exculpatory value that is apparent at the time of the loss or destruction. *California v. Trombetta*, 467 U.S. 479, 489, 81 L. Ed. 2d 413, 422, 104 S. Ct. 2528, 2534 (1984). Defendant has failed to show that the methamphetamine solution in the jars or the photographs had any exculpatory value whatsoever. "[T]he most that can be said of the [lost or] destroyed evidence is that it had the potential to exonerate [the defendant]" (*In re C.J.*, 166 Ill. 2d 264, 274-75, 652 N.E.2d 315, 320 (1995))—and, by the same token, the potential to banish any hope of exoneration. It appears the State "had at least as great an interest in preserving the evidence as did the person later accused of the crime." *Arizona v. Youngblood*, 488 U.S. 51, 59, 102 L. Ed. 2d 281, 290, 109 S. Ct. 333, 338 (1988) (Stevens, J., concurring).

If the State destroys evidence that is potentially useful to the defense (instead of obviously exculpatory), the defendant must show the State did so in bad faith. *Youngblood*, 488 U.S. at 58, 102 L. Ed. 2d at 289, 109 S. Ct. at 337; *Illinois v. Fisher*, 540 U.S. 544, 549, 157 L. Ed. 2d 1060, 1067, 124 S. Ct. 1200, 1203 (2004). Mere negligence or sloppiness is not bad faith. *Youngblood*, 488 U.S. at 58, 102 L. Ed. 2d at 289-90, 102 S. Ct. at 337; *People v. Tsombanidis*, 235 Ill. App. 3d 823, 832, 601 N.E.2d 1124, 1131 (1992). According to the unrebutted

testimony at trial, when members of the Task Force seized methamphetamine solution, they routinely destroyed all but a small sample of it because storing large amounts of it in the evidence vault was dangerous and impractical. The police had to don respiratory masks just to enter the garage in which they found the two jars. Destroying hazardous material pursuant to a routine, well-intentioned policy cannot be bad faith. See *C.J.*, 166 Ill. 2d at 273-74, 652 N.E.2d at 320. The loss of the photographs was, at worst, negligence. "The record contains no allegation of official animus towards [defendant] or of a conscious effort to suppress exculpatory evidence." *Trombetta*, 467 U.S. at 488, 81 L. Ed. 2d at 422, 104 S. Ct. at 2533. We find no evidence of bad faith in either the destruction of the jars of methamphetamine solution or the loss of the photographs, and thus we find no violation of due process in that regard. See *Fisher*, 540 U.S. at 547-48, 157 L. Ed. 2d at 1066-67, 124 S. Ct. at 1203.

Nor do we find any violation of Rule 412 (188 Ill. 2d R. 412). Except for the 25-milliliter samples, the methamphetamine solution was not "within [the State's] possession or control" when defendant filed his discovery motion. See 188 Ill. 2d R. 412(a). The record appears to contain no evidence that the photographs were still in existence and therefore in the State's "possession or control" when defendant requested them in discovery (see 188 Ill. 2d R. 412(a)(v)) or that the photographs or the rest of the solution would have tended to negate his guilt or reduce his punishment (see 188 Ill. 2d R. 412(c)).

### C. Proving the Weight of the Methamphetamine Solution

■ Defendant argues that because no one actually weighed the solution in the two jars (other than 39.4 grams of it), the State failed to prove he manufactured 400 grams or more of a substance containing methamphetamine, as charged in count I (720 ILCS 570/401(a)(6.5)(C) (West 2000)). We agree.

Citing our decisions in *People v. Roy*, 172 Ill. App. 3d 16, 25, 526 N.E.2d 204, 209 (1988), and *People v. Eichelberger*, 189 Ill. App. 3d 1020, 1027, 546 N.E.2d 274, 278 (1989), the State argues that "a quantitative procedure need not have been used to determine the weight of the substance." In *Eichelberger*, 189 Ill. App. 3d at 1027, 546 N.E.2d at 278, the identity of the powder as cocaine was at issue, not its weight. Just because someone who has used cocaine in the past can identify a substance as cocaine by paying an exorbitant price for it, ingesting it, and "getting high" (*Eichelberger*, 189 Ill. App. 3d at 1028, 546 N.E.2d at 279), it does not follow that someone, by his or her unaided senses, can reliably conclude that the solution in two "approximately" half-full quart jars weighs a total of 400 grams or more.

In *Roy*, 172 Ill. App. 3d at 25, 526 N.E.2d at 209, the defendant contended "there was no evidence to support a finding of the requisite amount of drugs." We responded: "There was testimony which indicated [the drug dealer] purchased four ounces of cocaine worth in excess of $7,000 ***[,] which was part of '20 to 30 ounces' received by [the drug dealer] from the defendant." *Roy*, 172 Ill. App. 3d at 25, 526 N.E.2d at 209. Because of the high price of cocaine ($1,800 to $1,900 per ounce (*Roy*, 172 Ill. App. 3d at 19, 526 N.E.2d at 205)), one might expect traffickers in that commodity would be scrupulous about weighing it. In the present case, there appears to be no evidence that the methamphetamine solution in the jars had been weighed in contemplation of a sale.

Further, it does not appear, from our reported opinion in *Roy*, that the defendant in that case ever objected to the drug dealer's testimony on the ground of a lack of foundation. If the defendant never did so, he conceded the adequacy of the foundation, and the sufficiency of the evidence was unaffected as if an adequate foundation had in fact been laid. See *People v. Besz*, 345 Ill. App. 3d 50, 55, 802 N.E.2d 841, 846 (2003). In the present case, defendant made repeated foundation objections to Bowersock's and Livingston's testimony. If those objections were valid, we should disregard the inadmissible testimony, and the resulting gap in the State's case could, as defendant contends, make the evidence insufficient to convict him of manufacturing 400 grams or more of methamphetamine solution, as charged.

Hypothetically, for illustration, let us assume Bowersock testified he weighed all of the solution on a brand-new, state-of-the-art digital scale. Further assume that defendant objected to the testimony on the ground of a lack of foundation. The trial court should have sustained the objection. "The foundation for [the police officer's] testimony concerning the weight of the substance was not sufficiently proved in absence of testimony that verified the accuracy of the scale." *People v. Speed*, 106 Ill. App. 3d 890, 896, 436 N.E.2d 712, 716 (1982); see *People v. Payne*, 239 Ill. App. 3d 698, 709, 607 N.E.2d 375, 383 (1993).

Bowersock testified that, in his experience, a quart jar one-fourth full of methamphetamine solution weighed 300 to 400 grams. Livingston testified that pure ether weighed 21 grams per ounce. They could not have testified to those weights unless someone—sometime, somewhere—had weighed methamphetamine and ether on a scale. On appeal, defendant does not specifically argue a lack of foundation, but we find the lack of foundation to be inextricably twined with the issue he does raise: the sufficiency of the evidence—in particular, the sufficiency of the evidence of gram weight. "Laying a foundation" means "[i]ntroducing evidence of certain facts needed to render later evidence

relevant, material, or competent." Black's Law Dictionary 896 (7th ed. 1999). If evidence of scale weight is insufficient or incompetent without predicate evidence that the scale is accurate (*Speed*, 106 Ill. App. 3d at 896, 436 N.E.2d at 716), we do not see how evidence of the scale weight of other jars of solution besides the ones in this case, without evidence of the accuracy of those scales, could be sufficient, either. In short, we do not see how "eyeballing it" will suffice if case law, in the interest of accuracy, imposes an exacting foundational requirement when somebody testifies to actually putting the object on a scale and weighing it.

Standerfer testified, hypothetically, that a fluid ounce of diethyl ether weighed 21 grams. One could not use that testimony to calculate the minimum weight of the solution in the two jars; there appears to be no evidence that ether was the only liquid the jars contained. The police also found a partly empty can of camping fuel, and it is unclear that camping fuel is the same thing as ether. The record appears to contain no evidence that starting fluid, or ether, weighs as much as, or more than, camping fuel. Further, comparing the jars of solution in this case to other jars of solution assumes the same proportion of ingredients in the two groups of jars, an assumption that appears to have no basis in the record.

Looking at the evidence in a light most favorable to the prosecution (*People v. Collins*, 106 Ill. 2d 237, 261, 478 N.E.2d 267, 277 (1985)), we find the State proved defendant manufactured only 39.4 grams of methamphetamine solution, not 400 grams or more. We direct the trial court to reduce the conviction on count I accordingly (720 ILCS 570/401(a)(6.5)(A) (West 2000)).

## D. Denial of Motions for Mistrial

Defendant contends that "information concerning [his] prior arrest was extremely prejudicial" and "the trial court's failure to declare a mistrial after these statements were made denied [him] a fair trial." He cites *People v. Keegan*, 52 Ill. 2d 147, 286 N.E.2d 345 (1971), *People v. Jones*, 105 Ill. 2d 342, 475 N.E.2d 832 (1985), and *People v. Rogers*, 135 Ill. App. 3d 608, 482 N.E.2d 639 (1985), among other authorities.

The prior arrest was, of course, irrelevant to any issue in this case (see *Rogers*, 135 Ill. App. 3d at 627, 482 N.E.2d at 652), but unlike the jury in *Rogers*, 135 Ill. App. 3d at 625, 482 N.E.2d at 651, the venire in this case never learned the reason for the arrest; it could have been a mundane traffic offense or even a mistake by the police. The bare fact of defendant's prior arrest is not even remotely comparable, in its prejudicial impact, to the scandalous newspaper article in *Keegan*, 52

Ill. 2d at 155, 286 N.E.2d at 349, or the racist joke in *Jones*, 105 Ill. 2d at 350, 475 N.E.2d at 836. We find no clear abuse of discretion in the denial of defendant's motions for mistrial. See *People v. Sims*, 167 Ill. 2d 483, 505, 658 N.E.2d 413, 423 (1995).

### E. Alleged Ineffective Assistance of Counsel

■ Upon denying defense counsel's second motion for a mistrial, the trial court told her she could question the remaining venire members to ascertain whether they, too, like Shellaburger, felt their impartiality was compromised by knowledge of defendant's prior arrest. Defense counsel declined to do so, and defendant claims that omission was so egregious and harmful as to amount to ineffective assistance of counsel.

After Hodges revealed the prior arrest, defense counsel asked the venire members if they had learned anything thus far that would affect their ability to be fair and impartial. They said no. When the trial court denied her second motion for a mistrial, defense counsel had to make a decision: she could either question the venire members more intensively on the prior arrest—at the risk of emphasizing it and signaling it had a greater importance than the venire members might have otherwise thought it deserved—or she could have taken their word for it that their ability to be impartial was unimpaired. She chose the latter option—arguably, a wise choice (see *People v. Lewis*, 88 Ill. 2d 129, 158, 430 N.E.2d 1346, 1360 (1981) ("some attorneys would think it best to say nothing at all, thus lessening the impact on the jury by not emphasizing the matter")). Wise or not, it was a tactical decision (see *Lewis*, 88 Ill. 2d at 158, 430 N.E.2d at 1360), which can never amount to ineffective assistance of counsel (see *People v. Whitamore*, 241 Ill. App. 3d 519, 525, 608 N.E.2d 1304, 1310 (1993)).

### F. *In Camera* Meetings and Sidebar Conference During *Voir Dire*

■ During *voir dire*, the trial court and attorneys had an *in camera* meeting, in which the court granted defense counsel's request to dismiss Hodges for cause and denied her first motion for a mistrial. The court also stated its intention to dismiss three other potential jurors for cause, whereupon the attorneys exercised peremptory challenges. Defendant did not personally attend this first *in camera* meeting. Although the court never personally asked defendant if he wished to attend, defense counsel told the court her client was "waiving his right to be [t]here."

Citing *People v. Mallett*, 30 Ill. 2d 136, 141-42, 195 N.E.2d 687, 690 (1964), among other authorities, defendant argues his attorney had no power to waive his right to be personally present at the *in camera* meeting but that only he himself could have done so by direct com-

munication with the trial court. He argues that because he was absent from the meeting, he missed a discussion of the prejudicial impact of Hodges's comments as well as the first motion for mistrial. He also claims his absence foreclosed him from offering any "input into defense counsel's use of a peremptory challenge."

In the second *in camera* meeting during *voir dire*, the trial court asked defense counsel: "[D]oes your client want to be with us?" She replied:

"MS. GARRETT: No, Your Honor.

THE COURT: Okay, and you have told him that he can be here if he wants to be?

MS. GARRETT: Yes, Your Honor."

With the concurrence of the parties, the court decided to dismiss three potential jurors for cause, including Shellaburger. Because of Shellaburger's comments, defense counsel renewed her motion for mistrial, which the court denied. After exercising peremptory challenges, the attorneys accepted a panel that included McMorris, who had said she was acquainted with Becker in his capacity as a client of State Farm Insurance Company, her employer.

Defendant complains that because of his absence from this second *in camera* meeting, "he had no input into defense counsel's use of the peremptory challenge or counsel's decision to accept a jury panel [that] included *** McMorris." He theorizes it is "possib[le]" that McMorris "had an impact on the outcome of the case, based on her special knowledge of *** Becker."

After the two *in camera* meetings and further questioning of the venire, the trial court called a sidebar conference, in which the court granted defense counsel's request to dismiss two potential jurors for cause and defense counsel exercised a peremptory challenge.

Defendant complains the trial court never asked if he wanted to attend the sidebar conference and "he was unable to have any input into his counsel's use of peremptory challenges."

According to defendant, "Illinois courts have not resolved whether the defendant's right to be present applies during jury challenges." We disagree. In *People v. Beacham*, 189 Ill. App. 3d 483, 491, 545 N.E.2d 392, 398 (1989), "*voir dire* was conducted in open court, after which the attorneys retired to the judge's chambers to exercise challenges." The defendant was present during the actual questioning of venire members and had an opportunity to consult with counsel regarding who should serve on the jury, but he did not accompany counsel into the judge's chambers, where "the juror challenges were made." *Beacham*, 189 Ill. App. 3d at 491, 545 N.E.2d at 398. The First District found "little merit" in the defendant's argument that he had

been excluded from a critical portion of the proceedings: "peremptory challenges may be exercised outside the presence of the defendant as long as the defendant is given the opportunity to confer with counsel beforehand." *Beacham*, 189 Ill. App. 3d at 492, 545 N.E.2d at 398, citing *People v. Spears*, 169 Ill. App. 3d 470, 483, 525 N.E.2d 877, 886 (1988).

In the present case, no venire members were questioned outside defendant's presence or hearing. Nothing prevented him from conferring with his counsel on the composition of the jury and the motions for mistrial. Just because he was not present when the choices and arguments were actually communicated to the trial court, it does not follow that his "participation in the jury selection was *** so limited as to deny him a fair trial." Presumably, defense counsel took into account any "input" from defendant when she acted on his behalf during the *in camera* meetings and sidebar conference.

## III. CONCLUSION

For the foregoing reasons, we remand this case with directions to reduce the conviction on count I to the manufacture of 39.4 grams of a substance containing methamphetamine and to hold a new sentencing hearing (720 ILCS 570/401(a)(6.5)(A) (West 2000)).

Remanded with directions.

COOK and STEIGMANN, JJ., concur.