THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. GARY EICHELBERGER, Defendant-Appellant.

Fourth District   No. 4—88—0769

Opinion filed October 12, 1989.

Arthur M. Lerner, of Lerner & Kirchner, of Champaign, for appellant.

Tony Lee, State's Attorney, of Paxton (Kenneth R. Boyle, Robert J. Biderman, and Dale M. Wood, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE GREEN delivered the opinion of the court:

On September 9, 1988, the circuit court of Ford County entered judgment on jury verdicts returned finding defendant Gary Eichelberger guilty of three counts of possession of 15 or more grams of

cocaine. (Ill. Rev. Stat. 1987, ch. 56½, par. 1402(a)(2).) The court subsequently sentenced him to a period of four years' probation and ordered him to pay a fine of $8,000.

Defendant now appeals, contending: (1) the State failed to prosecute him within the applicable statute of limitations; (2) the State failed to prove him guilty of the above offenses beyond a reasonable doubt; (3) the court erred in allowing a witness to testify concerning statements allegedly made by the defendant when such statements were not disclosed to defendant pursuant to Supreme Court Rule 412 (107 Ill. 2d R. 412); (4) the court erred in allowing a prosecution witness to testify concerning a prior consistent statement made by him; and (5) the court erred in failing to grant a mistrial due to improper arguments made by the State during closing and rebuttal arguments. We affirm.

Defendant was charged by information on January 29, 1988, in case No. 88—CF—2 with committing the following offenses: (1) three counts of unlawful possession of a controlled substance with intent to deliver; (Ill. Rev. Stat. 1987, ch. 56½, par. 1401(a)(2)); (2) three counts of unlawful possession of a controlled substance; and (3) one count of unlawful calculated criminal drug conspiracy (Ill. Rev. Stat. 1987, ch. 56½, par. 1405(a)). All crimes allegedly took place sometime "between February and the Spring of 1985." The State amended its information on May 20, 1988. The amended information was substantially similar to the original information except the State added additional defendants and a second count of unlawful calculated criminal drug conspiracy.

The evidence further revealed the State had also filed informations against defendant on December 9, 1986, and August 3, 1987, in case No. 86—CF—61. In each information, the State charged defendant with committing the offense of calculated criminal drug conspiracy. Finally, a grand jury returned an indictment on March 16, 1988, and an amended indictment on April 27, 1988, in case No. 88—CF—12, which charged defendant with committing the eight counts of drug-related offenses listed in the May 20, 1988, information.

Defendant initially contends the State failed in the instant case to commence its prosecution of the charges against him within the applicable three-year statute of limitations. (Ill. Rev. Stat. 1987, ch. 38, par. 3—5.) He notes the charges by the State stem from activity which allegedly occurred from February 1985 through spring of 1985, and the information upon which he was tried and ultimately convicted was not filed until May 20, 1988.

■■ ■ However, the period within which a prosecution must be

commenced does not include any period in which a prosecution is pending against the defendant for the same conduct. (Ill. Rev. Stat. 1987, ch. 38, par. 3—7.) A comparison of the January 29, 1988, information with the amended information filed May 20, 1988, clearly reveals an identity of offenses for all charges except a second count of calculated criminal drug conspiracy, an offense for which defendant was not convicted. Furthermore, the second-amended information contains allegations that the period within which prosecution had to be commenced against defendant did not include those periods in which the above indictments and informations were in full force and effect because all charges stemmed from the same conduct. Testimony by the former State's Attorney at the trial in this cause substantially corroborated those allegations. The State properly commenced its prosecution of the defendant within the applicable three-year statute of limitations period.

In order to determine whether the evidence was strong enough to support the convictions, we must examine the evidence in some detail. Defendant was tried jointly with his two other codefendants, Ronald L. Norman and Maurice Eichelberger. The main witness for the prosecution at that trial was William Cofel, who testified that, in February 1985, he and defendant "had some discussions" with regard to cocaine. He said defendant initially asked him if he wanted to go in with him in purchasing an ounce or two of cocaine. Cofel said they discussed the price, amount, and source of the cocaine. They decided Cofel would put up $3,000 for the drugs. They met again a few days later, and Cofel said defendant informed him he had "made the deal" and would be "getting the cocaine." Cofel then gave him the $3,000. Cofel said their goal was to purchase more cocaine after they sold the first quantity they received.

Cofel stated that, shortly thereafter, defendant came over to Cofel's home and brought the two ounces of cocaine with him. Cofel said he knew from past experience what cocaine looked like and the effects of that drug. However, they decided to "test out the drug" since they did not know what quality they had received. A friend came over, tried the drug with them and told them "it was pretty good stuff." Cofel explained they later took each ounce of cocaine, or approximately 28 grams, and added seven or eight "cuts" to it to make it go farther. They then packaged it up a gram at a time and placed it in brown, one-gram bottles. Cofel said they ended up with about 60 or 70 grams of cocaine. They left the majority of the drug in the basement, and Cofel, defendant and Ronald Norman took out a few bottles at a time to sell it. Cofel said each made approximately a $1,000

profit from the sale of the first supply of cocaine.

Cofel further testified that, in March 1985, he withdrew $6,000 from the bank and gave it to defendant to purchase more cocaine. He, defendant, and Ronald Norman then met, "cut" the cocaine, weighed it and bottled it up for sale. He estimated that, with this second "batch," they had a total of between seven and nine ounces to divide among them and sell.

Finally, Cofel testified that, during the latter part of March until the middle of June 1985, he and defendant worked together to make the third purchase of cocaine. He said all three contributed toward the purchase, and Cofel himself gave defendant between $2,500 and $3,500. Cofel said defendant purchased six ounces of cocaine, and he, defendant, defendant's brother Maurice Eichelberger, and Ronald Norman all met to prepare the cocaine for distribution. He said they sold this third batch of cocaine, which exceeded 30 grams, and delivered all of the money to Maurice Eichelberger.

Cofel said he used quite a bit of his share of the second and third batches of cocaine for his own personal use. He explained its usage made him "feel good" and caused his face, nose, and gums to become numb. He said he had experienced similar sensations when he had used cocaine in the past.

Judy Cofel, William Cofel's wife during the dates in question, also testified on behalf of the State. She said she remembered defendant came over to their home during February and March 1985, and he and her husband went down in their basement on those occasions. She said she saw the two men with a baggie of white powder and watched them snort the substance. She also discovered in her basement some small brown bottles in a paper bag, containers she had never seen before. She also became aware her husband was using cocaine between February and June 1985 because she learned he had been making large withdrawals from their bank account. She also said her husband discussed with her some disagreements he had been having with Maurice Eichelberger because he claimed Maurice was retaining too much of his money from the cocaine deals.

Maurice Eichelberger testified that, late in May or early in June 1985, his brother, the defendant, was quite depressed. He said his brother told him he had been "doing a lot of drugs over at Cofel's house," that he owed William Cofel a lot of money, and that Cofel had sold drugs. He recalled that both his brother and Ron Norman had spent a number of weekends over at Cofel's house.

Several witnesses then testified concerning their own experiences with either William Cofel or the defendant. For example, both Tom

Brown and Jerry Hempel testified they were familiar with Cofel as well as the three codefendants. They indicated that, in approximately April 1985, they separately went to Cofel's residence. Each snorted cocaine with Cofel, which cocaine had been supplied by him. They described the substance given to them by Cofel as a white powder which was contained in a brown vial. Both indicated they had used cocaine in the past. Brown stated the substance he ingested that April "just made him feel better," while Hempel said it gave him a light-headed, dizzy feeling. Hempel said he had experienced that same feeling in the past when he had used cocaine. Brown further said he had taken it for granted the substance Cofel gave him that April was cocaine, and he had no reason to change his mind afterward because "he knew what cocaine [was]." Brown said he had never seen defendant with any cocaine nor had he ever purchased any from him.

James Parcell testified he was familiar with the physical characteristics, methods of ingestion, and effects of cocaine because he had snorted it in the past. He specifically noted that, in the spring of 1985, defendant produced for him a small vial containing a white powdery substance which defendant referred to as cocaine. He stated he and defendant "did" the cocaine, which cocaine made his heart beat faster and made him "high." He said the substance he ingested that night with the defendant was similar to cocaine he had used in the past.

Several witnesses from various State-related agencies also testified concerning the drug, cocaine, and its side effects. For instance, Illinois State Police Lieutenant William Willis testified he had been involved in narcotics investigations in Ford County in the spring of 1985. He said the cocaine seized during those investigations was usually packaged in weights of grams up to a quarter ounce and were contained in plastic baggies and/or paper packets. He described the cocaine as a white crystal powder which sometimes also contained a chunk of white crystal powder. He stated a gram of cocaine at that time averaged from $85 to $120, while an ounce cost from $1,800 to $2,200. He admitted a "turkey sale," or a sale of a substance purporting to be something which it was not, could involve any amount. He said he had been told that cocaine usage could affect the nose of the user and cause a numbness.

Kenneth E. Wurl, a narcotics investigator for the Illinois State Police, stated he had in the past been involved in the purchase of anywhere from a gram to five ounces of cocaine at a given time. He said an ounce of cocaine contained 28.3 grams. He described cocaine as a white powdery substance. Gram packages of the substance usually

were delivered in small, folded paper packages. Other measures of cocaine came packaged in small, clear plastic baggies or foil packets. He stated that, in May 1986, when he first began working in narcotics investigation, cocaine cost approximately $2,000 an ounce.

Daniel Brown, the chief toxicologist for the Illinois State Police, testified he was familiar with the drug cocaine. He indicated that cocaine, when snorted through the nostrils of the nose, initially caused a numbness in the nose and then acted to increase the user's heart and respiration rates. He stated the drug also caused a state of excitement or euphoria. He, too, described cocaine as a white powdery substance. However, he indicated on cross-examination that other drugs also came in a white powdery form and caused a numbness of the tongue, lips, or nose when ingested.

Brown said the laboratory normally did a minimum of two tests on a substance sent to it before deciding what type of drug it was. However, he stated he would be able to form an opinion as to the nature of a particular substance and would be able to exclude other drugs with a reasonable degree of medical certainty if he knew the substance (1) was inhaled nasally, (2) had a local anesthetic effect on the nose, (3) increased the heart rate, and (4) caused a euphoric effect.

■ To support a conviction for the offense of unlawful possession of a controlled substance, the State must prove beyond a reasonable doubt the defendant had knowledge of possession of the controlled substance, and the controlled substance was in the immediate and exclusive control of the defendant. *People v. Burke* (1985), 136 Ill. App. 3d 593, 483 N.E.2d 674.

The State must also prove beyond a reasonable doubt that the substance possessed by the defendant was the controlled substance charged. Defendant strongly asserts that proof was not made here. The State concedes none of the alleged substance was produced at trial, nor were any tests performed on samples of it. However, it argues it presented sufficient facts regarding the substance from which the jury could infer the powder was, in fact, cocaine.

■ It is undisputed a substance alleged to be a narcotic drug can be so proved by circumstantial evidence, and the State is not required to prove it through evidence of a chemical test. In *People v. Robinson* (1958), 14 Ill. 2d 325, 153 N.E.2d 65, testimony of three longtime heroin users that a substance they had sampled was heroin was deemed to be sufficient to prove the nature of that substance. Similarly, in *People v. Binkley* (1975), 25 Ill. App. 3d 27, 322 N.E.2d 514, the testimony of a person familiar with cannabis that a substance she had

smoked was cannabis was held to be sufficient to prove that was so. Defendant maintains the persons identifying the substance here as cocaine lacked the experience of those in *Robinson,* and cannabis is easier to recognize than cocaine. While those contentions may be true, the differences between the circumstances here and in those cases merely go to the weight to be given to the testimony of the witnesses.

Moreover, various factors can be examined in order to establish a powder was actually a controlled substance, including the following:

> "The exorbitant price paid for the small amount of substance; the fact it was a powder; that [the witness] had been a user and had had previous transactions in narcotics with the [defendant]; *** that [the witness] sold the substance to his customers as [a controlled substance] and that none of them 'kicked' or complained ***." *Toliver v. United States* (9th Cir. 1955), 224 F.2d 742, 745.

Here, the testimony of William Cofel established defendant was involved on three separate occasions in the purchase, preparation, and sale of more than 30 grams of cocaine. His testimony showed in particular that defendant made numerous visits to Cofel's home to discuss their purchase arrangement, to cut and bottle their purchase, and to pick up smaller quantities for subsequent sale. These extensive visits and defendant's use of drugs at Cofel's home were corroborated by the testimonies of codefendant Maurice Eichelberger and Judy Cofel.

Cofel's testimony further revealed he, either alone or in conjunction with defendant and Norman, contributed substantial amounts of money toward each of the purchases of the substance in question. The amounts paid were consistent with the then "going price" of cocaine as established by witnesses Willis and Wurl. Several witnesses identified the substance in question as a white powder found either in little brown bottles or in clear plastic baggies. While William Cofel was the only witness who actually testified he had used the substance in question, his testimony established he had seen and used cocaine in the past. He said his experiences with the substance obtained on each of the three occasions here resulted in sensations similar to those he had experienced in the past. He said its usage made him "feel good" and caused his face, nose, and gums to become numb. The testimony of Brown, Hempel, and Parcell revealed they had snorted a white powder with either Cofel or the defendant during the time period in question and sustained effects similar to those they had experienced in the past when they had ingested cocaine. Two witnesses from different State agencies also testified regarding the effects of cocaine on the

user, many of which were similar to those personally experienced by the above witnesses.

Citing *People v. Newell* (1984), 103 Ill. 2d 465, 469 N.E.2d 1375, and *People v. Gnat* (1988), 166 Ill. App. 3d 107, 519 N.E.2d 497, defendant asserts this is a case where the proof of the guilt of the accused is dependent entirely upon the testimony of an accomplice, here Cofel. Under those circumstances, the testimony of the accomplice must be viewed with caution on review and will not be sufficient to support a conviction unless the testimony is clear and convincing. Such circumstances did not exist here. Cofel's testimony tying defendant to possession of cocaine with intent to deliver was corroborated by the testimony of (1) Cofel's wife, who may or may not have been estranged from him; and (2) the testimony of Maurice Eichelberger that defendant admitted to him he had been "doing a lot of drugs" with Cofel at the time in question.

It is the jury's function to determine the credibility of the witnesses, the weight to be given their testimony, and inferences to be drawn therefrom. The jury's determination of guilt should not be disturbed on review where, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Emphasis in original.) (*Jackson v. Virginia* (1979), 443 U.S. 307, 319, 61 L. Ed. 2d 560, 573, 99 S. Ct. 2781, 2789; *People v. Collins* (1985), 106 Ill. 2d 237, 261, 478 N.E.2d 267, 277, *cert. denied* (1985), 474 U.S. 935, 88 L. Ed. 2d 274, 106 S. Ct. 267.) A consideration of all of the foregoing evidence leads us to conclude the State produced sufficient evidence to support a verdict finding defendant guilty of three counts of unlawful possession of cocaine beyond a reasonable doubt.

Defendant next contends the court erred in allowing William Cofel to testify concerning statements allegedly made by the defendant when such statements were not disclosed to him pursuant to Supreme Court Rule 412. That rule states in pertinent part as follows:

"(a) *** [T]he State shall *** disclose to defense counsel the following material and information within its possession or control:
*** 

(ii) any written or recorded statements and the substance of any oral statements made by the accused or by a codefendant, and a list of witnesses to the making and acknowledgment of such statements." 107 Ill. 2d R. 412.

The issue was first raised in regard to the State's opening state-

ment. There, the State indicated the evidence would show the defendant and William Cofel had discussions concerning the purchase and sale of cocaine, whereby defendant was to obtain the cocaine and Cofel was to supply the "seed money" involved. Defense counsel objected on the ground that no statements by any defendant had been delivered to him pursuant to Rule 412. The State told the court prior discovery had informed defendant that Cofel, defendant, and Ronald Norman had had discussions concerning cocaine and what role each particular person would play. Furthermore, it stated the substance of the oral statements made by the defendants was set out in the police reports. The court then overruled defendant's objection.

■ The function of an opening statement is to apprise the jury of the evidence each party expects to prove at trial. (*People v. Roberts* (1981), 100 Ill. App. 3d 469, 426 N.E.2d 1104.) Error can occur in a criminal prosecution when the State asserts facts or propositions in its opening statement which are not later presented at trial. (*People v. King* (1986), 109 Ill. 2d 514, 488 N.E.2d 949, *cert. denied* (1986), 479 U.S. 872, 93 L. Ed. 2d 173, 107 S. Ct. 249.) Evidence was presented in the instant case which did reveal the substance of the conversations between Cofel and defendant. As we subsequently explain, no reversible error resulted from the admission of that evidence. Accordingly, no reversible error resulted from the State's opening statement.

Defense counsel's next objection based upon Rule 412 occurred when the State asked witness William Cofel to describe a conversation he said he had with codefendant Maurice Eichelberger. The evidence was being introduced in the case against the defendant. When the State informed the court the witness was recalling information not previously disclosed by him to the State, the court overruled the objection.

■ Supreme Court Rule 412(f) places responsibility on the State to "ensure that a flow of information is maintained between the various investigative personnel and its office sufficient to place within its possession or control all material and information relevant to the accused and the offense charged." (107 Ill. 2d R. 412(f).) However, the State cannot be accused of withholding evidence which is not in its possession and cannot supply that which it does not have. (*People v. Hamm* (1985), 136 Ill. App. 3d 11, 482 N.E.2d 1103, *cert. denied* (1986), 475 U.S. 1088, 89 L. Ed. 2d 730, 106 S. Ct. 1475.) The defense made no showing contrary to the State's explanation that the information concerning defendant was newly obtained. The court correctly overruled the above-mentioned objection.

■ Finally, defense counsel objected on Rule 412 grounds when

the State asked witness William Cofel to recall what defendant told him in March 1985 when he delivered six ounces of cocaine to him. After the court overruled the objection, the witness proceeded to implicate codefendant Maurice Eichelberger as a participant in the last cocaine transaction. The record fails to indicate whether the State disclosed evidence of this statement to defendant. However, because this evidence centered mainly on the State's case against Maurice Eichelberger and prejudiced defendant only in relation to the conspiracy charge, a charge for which he was not convicted, any error in the admission of such statement was harmless.

Next, defendant contends the court erred in allowing a witness to testify in rebuttal concerning a prior consistent statement made by him. During cross-examination by defendant's counsel, William Cofel testified concerning his prior dealings during 1986 with numerous persons other than the defendant involving cocaine transactions. He further testified regarding his earlier plea arrangement with the State whereby he pleaded guilty to a prior unrelated offense in exchange for his agreement to testify on behalf of the State.

His testimony further revealed the following chain of events: (1) around the end of August or first of September, 1986, he first "realized he was in trouble" and went to talk to his attorney; (2) during October 1986, Cofel learned of a grand jury indictment pending against him and further learned the police wanted to talk to him regarding cocaine sales; (3) during October 1986, Cofel turned himself in; (4) on November 24, 1986, Cofel pleaded guilty to a prior, unrelated charge, was granted probation, and agreed to testify on behalf of the State in those cases in which he was involved; and (5) on December 3, 1986, Cofel informed law enforcement authorities about his prior dealings with the defendant.

During cross-examination, defendant's counsel clearly attempted to establish Cofel possessed a motive to testify falsely concerning the defendant. Over defense objection, the State later elicited testimony from Cofel on rebuttal that, toward the end of October or first of November 1986, he told his lawyer he had been involved with the defendant in buying and selling cocaine.

■ Prior consistent out-of-court statements are admissible in evidence when, as here, the State seeks to introduce it to refute a charge of recent fabrication or when it is suggested the witness had a motive to testify falsely. (*People v. Burns* (1986), 144 Ill. App. 3d 345, 494 N.E.2d 872.) However, such statements are admissible only if they were made at a time when the motive did not exist or the effect of the story could not have been foreseen. *People v. Powell* (1973), 53

Ill. 2d 465, 292 N.E.2d 409.

In *People v. Green* (1984), 125 Ill. App. 3d 734, 466 N.E.2d 630, this court held the trial court committed error in admitting prior consistent statements made against the defendant by his two accomplices at a time when the investigation had centered upon those individuals. This court determined the motive to testify falsely had already arisen at that point because "it must have been apparent to them that they were prime suspects and faced with criminal liability for [the offenses in question]. The motive to place the onus on defendant must have been present." *Green*, 125 Ill. App. 3d at 745, 466 N.E.2d at 637.

More recent decisions of the supreme court in *People v. Ashford* (1988), 121 Ill. 2d 55, 520 N.E.2d 332, *cert. denied* (1988), 488 U.S. 900, 102 L. Ed. 2d 234, 109 S. Ct. 246, and *People v. Titone* (1986), 115 Ill. 2d 413, 505 N.E.2d 300, *cert. denied* (1987), 484 U.S. 873, 98 L. Ed. 2d 162, 108 S. Ct. 210, are of particular significance to the problem of the prior consistent statement admitted into evidence here. In *Ashford*, a prosecution witness in a similar case who had testified at trial concerning admissions made by that defendant to him was impeached by prior inconsistent statements. The supreme court held that the circuit court properly permitted the prosecution to rehabilitate the witness by a prior consistent statement given to police while he was in jail on a minor unrelated charge and unable to post bond. No evidence indicated that any promise had been made to that witness at the time of his prior consistent statement. Similarly, in *Titone* a State witness in a murder case testified to driving a vehicle, into which the defendant and the others had forced two bound men, to a place where they were taken from the vehicle and left after shots had been fired. That witness was impeached by a prior inconsistent statement and evidence of her drug abuse. The supreme court held the trial court then properly admitted rehabilitative testimony of a prior consistent statement she had given to police at a police station when she was taken by police on the day of the murder. The supreme court stated that the trial court could properly have determined that the witness had no motive to fabricate at the time of the statement. The evidence did not indicate she had been offered any leniency for the statement at the time it was made.

At the time Cofel made his prior consistent statement in the instant case, he knew the police were investigating him and wanted to question him regarding his prior cocaine dealings. He further knew a grand jury indictment was pending against him. However, the record fully shows Cofel had been involved in buying and/or selling cocaine with many persons other than defendant, and pending investigations

had not necessarily centered on his specific dealings with defendant. Thus, the focus of law enforcement upon him in regard to the case where his testimony was used was no greater than that upon the accomplice witness in *Titone*. Unlike in that case, Cofel did not make the consistent statement after being taken there by police. In fact, the statement was not made to police but to the lawyer of the witness, who could not make any concession to the witness for the statement. We have some concern with regard to the ramifications of the use of a statement by a witness to a lawyer for the purpose here because of the complications which might arise.

On the basis of the precedent of *Ashford* and *Titone* and for the other reasons stated, we hold the court properly permitted the introduction of the prior consistent statement by Cofel here.

Finally, defendant contends the court erred in failing to grant a mistrial due to allegedly improper comments made by the State during closing and rebuttal arguments. We note initially that many of the objections were sustained by the court, and the court either directed the State to correct its error or instructed the jury to disregard it. Generally, when the court sustains an objection or admonishes the jury, any error resulting from the comment is cured. *People v. Campbell* (1984), 126 Ill. App. 3d 1028, 467 N.E.2d 1112.

The most notable claims of error by defendant involve comments concerning the main witness for the prosecution, William Cofel. Throughout closing and rebuttal arguments, the State continuously referred to his testimony as "uncontradicted" or "unrebutted" or "consistent." The State further remarked Cofel "had no reason to lie" and "didn't have to talk."

However, the State may discuss the credibility of witnesses during closing and rebuttal arguments when such discussion is based upon the evidence or reasonable inferences therefrom. The prosecutor is entitled to assume the truth of his evidence. It is also permissible for the State to describe its evidence as "uncontradicted." *People v. Bryant* (1983), 94 Ill. 2d 514, 447 N.E.2d 301; *People v. Redman* (1986) 141 Ill. App. 3d 691, 490 N.E.2d 958.

The State also commented that, if Cofel were "going to make up a lie and *** try to convict somebody, he could have told [the State] a better story ***. And, of course, if [the State] knew [he was going to lie, it] wouldn't even put him on." An objection by counsel for a codefendant was overruled by the court. While we note this comment was erroneous, we cannot conclude it, standing alone, resulted in reversible error.

Finally, the State made the following comment to the jury

during its rebuttal: "Your decision has to be beyond a reasonable doubt, but I didn't hear anything from any defendant that seriously contests the fact that this is cocaine." The court sustained an objection to that statement by counsel for a codefendant and instructed the jury to disregard it. The State also subsequently clarified its comment. While these admonitions and clarifications sufficed to cure any error which occurred by this remark, we further note it can be proper for the State to comment on the failure of a defendant to present evidence which could support his case. *People v. Williams* (1968), 40 Ill. 2d 522, 240 N.E.2d 645; *People v. Depner* (1980), 89 Ill. App. 3d 689, 411 N.E.2d 1368.

The trial court did not err in denying defendant's motion for a mistrial. However, we deem it appropriate to comment that the prosecutor here unnecessarily flirted with violating the right of the defendant and committing reversible error. We believe that more careful preparation of closing argument can prevent that from happening in the future.

For the reasons stated, the judgment of the circuit court of Ford County is affirmed.

Affirmed.

McCULLOUGH, P.J., and STEIGMANN, J., concur.