THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. RONALD LIBMAN, Defendant-Appellant.

First District (5th Division)   No. 1—92—0110

Opinion filed June 30, 1993.

Tuite, Stratton & Menaker, of Chicago, for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Linda Woloshin, and Marci L. Jackson, Assistant State's Attorneys, of counsel), for the People.

JUSTICE McNULTY delivered the opinion of the court:

Ronald Libman was indicted for the offenses of solicitation to commit murder for hire, conspiracy to commit murder, attempted murder, aggravated battery, residential burglary and home invasion. After a jury trial by the circuit court of Cook County, Illinois, Libman was convicted of all counts and was sentenced to concurrent terms of 24, 15, 10 and 7 years in the Illinois Department of Corrections. A timely notice of appeal was filed.

In requesting that this court reverse his conviction, defendant makes four arguments: (1) the evidence was insufficient to sustain a conviction; (2) the trial court improperly excluded testimony of a defense witness which, defendant claims, would have contradicted the testimony of a prosecution witness; (3) the trial court improperly excluded the substantive aspects of letters written by the defendant, limiting their use to handwriting comparison only; and (4) the sentencing structure establishing a 20-year minimum for a person who solicits another to commit the offense of first-degree murder and only provides for a three- to seven-year sentence for the person who accepts the solicitation and attempts to carry it out is unconstitutional.

Defendant began working for Rite-Way Messenger Service in 1988. In February 1990, he was executive assistant to Rich Weisen-

mayer, the president and one of three founding partners of the company. During the time period of September 1989 to February 1990, defendant complained repeatedly to John Mackrell, a former Rite-Way employee, and to his wife, Marlene Libman, about Rich Weisenmayer. Defendant told his wife that he did not like Weisenmayer and that "it would be better off if he [Weisenmayer] was out of the picture, and he hoped that [Weisenmayer] would die from his alcoholism." In mid-December 1989, defendant and his wife had a conversation in their car in which defendant told her that he wanted to hire Bill Bailey, an old Marine buddy, to "do away with Rich [Weisenmayer] *** [defendant] wanted to kill [Weisenmayer]." Defendant told Ms. Libman that if "Rich Weisenmayer was killed *** [defendant's] father would obtain Rite-Way and [defendant] could do better for himself *** [and defendant] could drive Cadillacs and have nice jewelry and stuff."

Mackrell testified that defendant discussed with Mackrell his theory that Rite-Way was going downhill because of Weisenmayer's drinking problems. Defendant told Mackrell that he wanted to get rid of Weisenmayer legally—by having Weisenmayer declared incompetent—but defendant thought that would take too long. Defendant suggested that Mackrell murder Weisenmayer. Defendant agreed to give Mackrell $500, arrange a change of identification for him, and get him a job at Rite-Way paying $500 per week in return for the murder of Weisenmayer. Defendant told Mackrell that once Weisenmayer was out of the way, he would take over Weisenmayer's responsibilities and "have the run of the company." Defendant and Mackrell agreed that a break-in burglary would be the method used to carry out the murder of Weisenmayer. They decided that the best time for the murder would be late at night. Because Mackrell had never been to Weisenmayer's trailer before, and because the trailer park consisted of unmarked streets, defendant drew maps of the trailer park and the inside layout of Weisenmayer's mobile home so Mackrell could find it.

In the early morning hours of February 20, 1990, Mackrell took the "el" train to O'Hare airport in Chicago, Illinois, and then took a cab to Weisenmayer's trailer park. When he located the trailer, he looked inside a window and observed Weisenmayer sitting on a sofa. It was between 5:30 and 6 a.m. at this point and Weisenmayer had just awakened. After deciding that prying the door open would make too much noise, Mackrell decided just to knock. Weisenmayer testified that he heard the knock and asked, "Who's there?" He thought the person said, "I'm here for Brian," his grandson, and so

he opened the door. Mackrell entered the mobile home and proceeded to hit Weisenmayer over the head with a pry bar. Weisenmayer knew who John Mackrell was due to Mackrell's former employment at Rite-Way. Mackrell told Weisenmayer that he was there "to kill you [Mr. Weisenmayer] for Ron. Ron wants me to kill you." Mackrell continued to hit Weisenmayer over the head with the crowbar. Eventually, Weisenmayer offered Mackrell $10,000 to stop hitting him and Mackrell accepted the offer. Mackrell and Weisenmayer agreed that when the bank opened at 9 a.m., Weisenmayer would go there and write Mackrell a check for the $10,000. Thereafter, Weisenmayer would drop Mackrell at the airport.

While they were waiting for the bank to open, Mackrell told Weisenmayer that defendant thought Weisenmayer was doing a terrible job running the company. Mackrell stated that defendant felt he could run Rite-Way better than Weisenmayer and that is why he wanted Weisenmayer out of the way. Mackrell told Weisenmayer that defendant was to give Mackrell a job at the company in exchange for killing Weisenmayer. Mackrell telephoned defendant from Weisenmayer's home during this discussion. Mackrell told defendant that Weisenmayer offered him $10,000, which was "better than the other offer." The record does not reveal what defendant said in response to Mackrell's statement but it is apparent, however, that defendant did not contact the police after this conversation. Mackrell was willing to take Weisenmayer to the hospital as long as he agreed to fabricate a story as to how Weisenmayer received his injuries. They determined that they would tell hospital personnel or police that Mackrell was a friend of defendant's and that he had gone to Weisenmayer's to do some plumbing work on the kitchen sink. They would say that Mackrell found Weisenmayer in his present condition when Mackrell arrived at the mobile home and that some unknown person had broken in and was responsible for Weisenmayer's injuries. On the way out of Weisenmayer's house, Mackrell took the $23 or $33 that was in Weisenmayer's wallet "to make it look like somebody came in and robbed him."

Mackrell drove Weisenmayer to the hospital in Weisenmayer's car from which they again called defendant. Mackrell told defendant not to tell anyone what happened and informed defendant about the plan he and Weisenayer had devised. In the emergency room, Weisenmayer was treated for his injuries. The police came to the hospital and questioned Weisenmayer and Mackrell about Weisenmayer's injuries. Initially, both of them related the fabricated version of events. The police then discovered that there was a warrant

out for Mackrell's arrest by the Marine Corps and, thus, Mackrell was taken into custody. Later that morning, Detective Prandini spoke to Weisenmayer again and informed him that Mackrell had already told them the real story. At this time, Mr. Weisenmayer told the police the truth about the events of the morning. Meanwhile, at the police station, Mackrell, too, eventually confessed the truth about Weisenmayer's injuries.

Marlene Libman spoke to police about the incident about a week after it happened. In early March 1990, while Mackrell remained in jail, he had his girl friend retrieve from his apartment and turn over to police the maps of the trailer park and Weisenmayer's home that defendant had drawn. On March 12, 1991, Weisenmayer turned over to police documents from Rite-Way that defendant had written up as samples of defendant's handwriting. Next, a handwriting expert testified that within a reasonable degree of scientific certainty, defendant probably drew the maps turned over to police by Mackrell's girl friend.

Defendant was arrested March 16, 1990, and indicted in April 1990, based on the events described above. In April 1991, Marlene provided Detective Prandini with letters defendant had written to her, also for use as handwriting samples. All of these letters were written after defendant had been indicted for soliciting the murder of Weisenmayer. Subsequently, defendant was brought to trial.

Weisenmayer, Mackrell, and Marlene Libman all testified on behalf of the State. Marlene testified to the conversations she had with defendant wherein he told her that he wanted Weisenmayer killed.

John Mackrell, having pled guilty to the aggravated battery of Weisenmayer and having received a two-year prison sentence, recounted defendant's and his own role in the incident. He further testified that he was not mad at anyone for firing him from Rite-Way.

Detective Prandini testified to his knowledge of the events. He stated that in his initial interview of Mackrell, when Mackrell gave the false story, Mackrell answered the questions slowly and "appeared to be thinking out the answers before he was very hesitant to answer anything directly." The second time Detective Prandini interviewed Mackrell, when Mackrell told the truth, Mackrell's answers were "very forward, he gave the story, did not appear rehearsed. He just spilled his guts about the whole incident."

■ Defendant's first argument on appeal is that the evidence was insufficient to sustain a conviction. The general rule is that a

conviction will be sustained where, viewed in the light most favorable to the prosecution, the record evidence is such that a rational trier of fact could have found guilt beyond a reasonable doubt. (See *Jackson v. Virginia* (1979), 443 U.S. 307, 61 L. Ed. 2d 560, 99 S. Ct. 2781.) This rule gives due consideration to the fact that the court and jury saw and heard the evidence and recognizes that it is the duty of the trier of fact to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *People v. Holmes* (1990), 141 Ill. 2d 204, 565 N.E.2d 950.

A thorough review of the record in the light most favorable to the prosecution persuades us that a rational fact finder could have found defendant guilty of solicitation to commit murder for hire beyond a reasonable doubt.

Defendant's wife testified that defendant wanted to hire someone to kill the victim. The accomplice testified that defendant hired him to kill the victim and that defendant drew maps to and of the victim's home for the accomplice to use in carrying out their plan. In addition, evidence of defendant's motive was established.

Defendant alludes to the reliability concerns that arise when a conviction is based "mainly on the testimony of an accomplice." We are skeptical of uncorroborated accomplice testimony. Such testimony should be subject to careful scrutiny, "acted upon with great caution" and have the "absolute conviction of the truth." (*People v. Wilson* (1977), 66 Ill. 2d 346, 349, 362 N.E.2d 291.) However, even the uncorroborated testimony of an accomplice witness can suffice to sustain a criminal conviction where it convinces the jury of the defendant's guilt beyond a reasonable doubt. The State correctly notes that the weaknesses of accomplice testimony affect questions of the weight of the evidence and the credibility of the witness. And those matters are peculiarly within the province of the trier of fact. (*Holmes*, 141 Ill. 2d at 242, 565 N.E.2d at 967.) Moreover, this conviction was based on material corroboration of the testimony of an accomplice, which is entitled to great weight. (*Holmes*, 141 Ill. 2d at 242, 505 N.E.2d at 967.) The testimony of several other witnesses as well as physical evidence corroborated the accomplice testimony.

We therefore conclude that the record in the case at bar upholds the reliability of Mackrell's accomplice testimony. The jury was fully apprised of all of the charges against Mackrell and the agreement he made with the assistant State's Attorneys to testify truthfully in exchange for a lenient sentence. The jury considered these fac-

tors along with the substance of Mackrell's testimony in light of the rest of the evidence presented at trial. Defendant's wife, the victim, and defendant's own hand, in drawing maps to aid his accomplice, provided corroboration of defendant's guilt. The jury apparently gave this evidence great weight. We therefore conclude that the questions involving the credibility of the accomplice witness are insufficient to aid defendant's cause. We are unable to say that the evidence is so unreasonable, improbable or unsatisfactory as to justify a reasonable doubt as to defendant's guilt.

■ Testimony of the state of mind of the principle prosecution witness inconsistent with his trial testimony is admissible to show that the witness, as well as defendant, had a motive to harm the victim, Weisenmayer. However, the question, "You never bad-mouthed Rich Weisenmayer to Gary Shapiro [*sic*] Leiberman?" does not clearly establish that purpose. The key to saving for review error in excluding evidence is the offer of proof. The offer of proof discloses the nature of offered evidence and thereby enables the reviewing court to determine whether the exclusion was erroneous and harmful. (*Miller v. Chicago Transit Authority* (1966), 78 Ill. App. 2d 375, 223 N.E.2d 323.) When the objection to this question was sustained, counsel made no offer of proof to clarify for the record his purpose in asking the question. Since the purpose of the evidence is not clear, a detailed and specific offer of proof is required. (*People v. Jackson* (1989), 180 Ill. App. 3d 78, 90-91, 535 N.E.2d 1086; *Volvo of America Corp. v. Gibson* (1980), 83 Ill. App. 3d 487, 404 N.E.2d 406.) We will not speculate about counsel's motivation in the face of a silent record and will view the failure to make an offer of proof as a waiver of this point on appeal. It is also evident that even if the evidence had been admitted at trial it would not have affected the jury verdict in this case.

■ The third issue defendant raises on appeal is whether the trial court properly limited the use of letters written by Libman to handwriting comparison and excluded their substantive aspects. It is important to note that evidence is relevant where it "tends to make the questions of guilt more or less probable." (*People v. Ward* (1984), 101 Ill. 2d 443, 455, 463 N.E.2d 696, 702.) Moreover, "when evidence is competent only for one purpose, the other party is entitled by instructions to have it limited to the purpose for which it is proper." (*People v. Edwards* (1991), 144 Ill. 2d 108, 168, 579 N.E.2d 336, 361.) Furthermore, "the admission of evidence is within the sound discretion of the trial court, and its ruling should not be reversed absent a clear showing of abuse of that discretion."

(*Ward,* 101 Ill. 2d at 456, 463 N.E.2d at 702.) Defendant claims that the letters written to Marlene Libman should have been introduced to impeach Marlene Libman's credibility by showing that defendant "was a good and loving husband and cared for both his children," in spite of her testimony to the contrary. The State maintains that the substantive aspects of the letters are irrelevant in that they do not make the question of the defendant's guilt more or less probable. The substance of the letters consisted of defendant wishing Marlene and the boys well. Defendant's feelings about his family simply are not probative of any material element of the crimes for which he was convicted.

In support of his contention that the trial court erred in not allowing the defense to introduce substantive aspects of the letters, defendant cites two cases: *People v. Titone* (1986), 115 Ill. 2d 413, 505 N.E.2d 300, and *People v. Eichelberger* (1989), 189 Ill. App. 3d 1020, 546 N.E.2d 274. *Eichelberger* held that prior consistent out-of-court statements are admissible to refute a charge of recent fabrication or motive to testify falsely, provided that the statements were made when a motive to fabricate did not exist or the effect of the statements could not have been foreseen by the witness. The touchstone for deciding this issue is the presence of a motive to fabricate. In *Eichelberger* the witness did not have a motive to fabricate. There the jury verdict found defendant guilty of three counts of possession of 15 or more grams of cocaine. The main witness for the prosecution at trial, William Cofel, testified as to his involvement with the defendant in purchasing, selling, and distributing cocaine. During cross-examination, defendant's counsel sought to establish that Cofel possessed a motive to testify falsely concerning the defendant. After cross-examination, the State elicited testimony from Cofel on rebuttal that he had previously told his lawyer that he had been involved with the defendant in buying and selling cocaine. The State sought to introduce this testimony to refute the suggestion that the witness had a motive to testify falsely at the time of the trial. When Cofel told his lawyer of his involvement with the defendant in the buying and selling of cocaine, the focus of law enforcement was not upon him to the extent that he had a motive to fabricate at the time of the making of the prior consistent statements.

Similarly, *Titone* held that prior consistent statements were properly admitted to rebut an inference that a witness' testimony was of recent fabrication. The inference there was that the prosecution witness' trial testimony had been a fabrication. The State in-

troduced the witness' original statement to police in response to defendant's cross-examination. The State contended that the witness had no reason to fabricate her statement to the police because she was not offered any deal or threatened by the police in order to elicit the statement. The court affirmed the admission of the prior consistent statements.

In the case at bar, defendant's reliance on *Eichelberger* and *Titone* is misplaced. When defendant testified that he thought he was a caring father and husband, the State did not suggest that the witness had a motive to testify falsely or that the testimony was recently fabricated. There was no incentive to do so because defendant's feelings about his family were not material to the State's case. Even if the State did make this suggestion, defendant could not prove up his testimony by his "prior consistent statements" that he was a caring father through the letters he wrote after he was indicted because at the time the letters were written a motive to fabricate was present. Defendant knew that Marlene had given testimony against him in the grand jury hearing and was likely to testify at trial against him. There was a motive to fabricate at the time the statements were made, and the statements could not properly have been admitted.

Even if the trial court should have admitted the letters for their substance, any such error was harmless. The admission of the letters for their substance would not have changed the outcome of his trial.

■ Defendant contends that the sentencing structure establishing a 20-year minimum for a person who solicits another to commit the offense of first-degree murder (Ill. Rev. Stat. 1989, ch. 38, par. 8—1.2 (now 720 ILCS 5/8—1.2 (West 1992))), and only provides for a three- to seven-year sentence for the person who accepts the solicitation and attempts to carry it out (Ill. Rev. Stat. 1989, ch. 38, par. 8—2(c) (now 720 ILCS 5/8—2 (West 1992))), is unconstitutional. Defendant correctly observes that article I, section 11, of the Illinois State Constitution (Ill. Const. 1970, art. I, §11) provides that all penalties shall be determined according to the seriousness of the offense and with an eye toward rehabilitation of the offender. Nonetheless this court is reluctant to invalidate penalties prescribed by the legislature because it recognizes that it is the legislature which has been empowered to declare and define conduct constituting a crime and to determine the nature and extent of punishment for it. (*People v. Steppan* (1985), 105 Ill. 2d 310, 473 N.E.2d 1300.) Defendant suggests that one who accepts a solicitation to commit

murder is more culpable than one who solicits a murder for hire. However, this determination is one for the legislature to make. It is a function of the legislature to gauge the seriousness of various offenses.

Defendant's contention that the sentencing structure violates equal protection of the laws is one that need not detain us long. To succeed, defendant must show that the sentencing structure treats those within the same class dissimilarly. (*People v. Bradley* (1980), 79 Ill. 2d 410, 403 N.E.2d 1029.) Here, since a defendant convicted of aggravated battery is not similarly situated to one convicted of conspiracy, no equal protection violation can be incurred.

For the foregoing reasons, the judgment of the circuit court is affirmed.

Affirmed.

GORDON, P.J., and COUSINS, J., concur.