2020 IL App (2d) 170723-U
No. 2-17-0723
Order filed May 15, 2020

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) | Appeal from the Circuit Court of McHenry County. |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 15-CF-963 |
| | ) | |
| DURELLE J. HALL, | ) | Honorable |
| | ) | Sharon L. Prather, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE McLAREN delivered the judgment of the court.
Justices Jorgensen and Bridges concurred in the judgment.

**ORDER**

¶ 1    *Held*: (1) The trial court properly denied defendant's motion to suppress statements, as defendant knowingly and intelligently waived her *Miranda* rights and did not unambiguously invoke her right to counsel; (2) the State's failure to retrieve and test one syringe found by the homeowner two days after the police searched the home was not plain error; (3) the trial court did not err in instructing the jury regarding causation; and (4) defendant was proved guilty beyond a reasonable doubt. Affirmed.

¶ 2    After a jury trial, defendant, Durelle J. Hall, was convicted of one count of Drug Induced

Homicide (720 ILCS 570/401 (West 2014)) arising from the 2015 death of Chelsie Kumm and

was sentenced to 14 years in the Department of Corrections. Defendant now appeals from her conviction. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4     The following evidence was adduced at trial. Chelsie Kumm died on October 6, 2015, in the home that she shared with Brandon Smedley and his mother, Laurie Cool. Cool had found Kumm in the basement bedroom. EMS attempts to resuscitate Kumm, including CPR and administration of Narcan, had failed. Paramedic Patrick Fanning testified that he found Kumm unresponsive on the floor of the basement, between a bed and the wall. He saw only one hypodermic needle, located on the dresser to Kumm's left.

¶ 5     Officer Andrew Taylor of the Marengo Police Department testified that he began collecting drug paraphernalia from the dresser and placing it on the bed, as the protocol for dealing with someone who will be resuscitated is to collect and dispose of all such items. Once he learned that Kumm was not going to survive, he stopped collecting the items, as the room was then considered a crime scene. He was not responsible for collecting other items, including baggies and a hypodermic syringe, that were located on an end table. Cool advised him that she saw a syringe on the living room floor; he collected it and saw a detective photograph it but did not know if it was preserved as evidence.

¶ 6     Deputy McHenry County coroner Paula Gallas testified that she first checked over Kumm's body in the ambulance parked outside of Cool's house. She noted what appeared to be puncture wounds in Kumm's neck, which she believed to be possible injection sites. Along with Detective Boeckh of the Marengo Police Department, she looked in the bedroom where Kumm had been found and discovered drug paraphernalia, including syringes, with a loaded syringe found on a nightstand, and prescription bottles for medications that were prescribed to persons other than

Kumm. Gallas noted that Kumm had a prescription for Suboxone, which is used to treat narcotics addiction, and had a history of cocaine, marijuana, and heroin use.

¶ 7    Brandon Smedley testified that he and Kumm had been dating since October 2014. In October 2015, Kumm lived with him in the basement bedroom of the house of his mother, Laurie Cool. Both he and Kumm used heroin, injecting it with a hypodermic syringe. They got their heroin "[t]hrough random sources," usually spending $100 per day on between three and six baggies of heroin per person.

¶ 8    On October 6, 2015, Kumm was sick from heroin withdrawal. Smedley took two Percocet pills that he had stolen from his mother to curb his own withdrawal symptoms then was driven to Crystal Lake by his friend Tiffany to sell more stolen Percocets in order to buy heroin. He had Kumm's cellphone with him. He bought one bag and ingested it before Tiffany dropped him back at home. Chelsie looked pale and was sweating; she had been throwing up while Smedley was gone.

¶ 9    Tiffany later drove both Smedley and Kumm to a gas station in Crystal Lake, where Smedley sold some Percocets, then dropped them both off at the Crystal Lake Metra station at about 5 p.m. Smedley left Kumm at the station and took the train to Chicago. He and Kumm exchanged text messages during the train ride, including a text from Kumm at 5:44 that said, "I got a ride I [*sic*] got $50 [and] im [*sic*] waiting on durelle [*sic*]….how long did that take[?]" According to Smedley, that meant that Kumm was getting three bags of heroin, as defendant sold heroin for $20 a bag or 3 bags for $50. Kumm then texted that she was "doing one at [ ] least." Smedley took this to mean that Kumm was going to do at least one bag of heroin before he got back home. Smedley explained that normally he "did it first. That way if there was something wrong, it didn't happen to her. It happened to me." While he was on the west side of Chicago, he

received a call from his mother, who told him that Kumm had overdosed and that the police were there.

¶ 10    While defendant was not the only person from whom Smedley had purchased heroin, he and Kumm had purchased heroin from defendant from five to seven times in the past. The full pink baggies of heroin found by the police were not in the house when he left that day. He identified the bags as the type that defendant used in her heroin sales; defendant was the only seller who used pink or purple bags to package the heroin.

¶ 11    Gilberto Martinez testified that his friend, Artemio Martinez, was a friend of Kumm. Artemio had once shown him a picture of her. Gilberto and Artemio lived in different buildings in the same apartment complex in October 2015. Gilberto was driven home from work at six or seven o'clock on October 6, 2015 by his brother-in-law, Jose Martinez. Gilberto saw a car parked in front of Artemio's building. A younger black man was in the driver's seat and a younger white woman with a tattoo of a rose on the left side of her neck was in the passenger seat. Gilberto later picked defendant out of a line-up as the woman in the car. Gilberto testified that he saw Kumm run out of Artemio's building to the car; she opened the back door and leaned in for a moment, then ran back to the building. He did not see Kumm take anything from anyone, nor did he see her holding anything or placing anything into her jeans as she ran back to the building.

¶ 12    Jose Martinez testified to the same incident as Gilberto had. He stated that a white woman and a black man were in the front seat of the car, but he could not remember who was in the driver's seat. The woman in the car had a tattoo on the left side of her neck but could not say what the tattoo was. Jose saw a white woman run up to the passenger side of the car for a few seconds then return to Artemio's apartment building. He did not see her take anything from the car or see her holding anything as she returned to the building. He had never seen Kumm or a picture of her

before her death; Artemio showed him Kumm's picture after her death, and Jose recognized her as the girl that ran up to the car.

¶ 13    Artemio Martinez testified that he knew Kumm for about two months at the time of her death. On October 6, Kumm texted him, asking him for a ride from the Crystal Lake Metra station. Artemio picked her up at about 4:00 p.m. and drove her to his apartment because she needed to charge her phone. Kumm texted while her phone was plugged in. She then told Artemio that she was not feeling well and that she needed $40 or $50 dollars for her medicine. She neither described her illness nor told him what medication she needed. After Artemio agreed to give Kumm the money, she began texting again, then told him that a male friend would stop by with the medicine.

¶ 14    About 20 minutes later, Kumm left the apartment. Artemio watched from a window as Kumm went to a grayish car and briefly got into the back seat before returning to the apartment. He could not see who else was in the car and did not see anyone give anything to Kumm. He also testified that he did not see Gilberto or Jose drive by.

¶ 15    Kumm then asked Artemio for a ride to her house in Marengo so she could prepare her medicine. Once at the house, Artemio waited upstairs while Kumm went downstairs to prepare her medicine. Kumm told him not to come down. Artemio could hear the sounds that Kumm's phone made as she texted someone. After about 40 minutes, he called Kumm's phone to tell her that he was leaving because it was getting late and he thought that Kumm's mother was coming home. The last time that he saw Kumm or talked to her was when she went downstairs.

¶ 16    Oscar Torres testified that in 2015, he ran a cell phone sales and repair shop from which he sold a phone to defendant. That phone was associated with a 224 area code phone number that was saved under the name "Durelle" in Kumm's phone. He was able to pick defendant out in a police line-up as the woman who bought the phone and identified her in court. While he had

received calls from defendant from that number several times, he did not verify defendant's continued ownership of the phone at the time that he spoke to police by calling the number.

¶ 17    Special Agent Nicholas Albert of the Drug Enforcement Administration testified that he extracted the contents of a Samsung cell phone provided to him by the Marengo police department. The phone contained a contact under the name "Durelle" that contained two phone numbers: (773) 256-7626 and (224) 465-8393.

¶ 18    Deputy Jason Novak of the McHenry County Sherriff's office testified that he interviewed defendant in 2011.  Defendant told Novak that she had been dealing heroin for about a year and that she had about 10 steady customers.  She sold the heroin, which she obtained on the west side of Chicago, in foil packets of one-tenth of a gram for 10 dollars apiece and usually sold 20 to 30 grams a week, resulting in a profit of $2000 a week.

¶ 19    Detective Shaun Boeckh of the Marengo police department testified that he arrived at Cool's house at about 9:30 p.m. on October 6, 2016.  Kumm was already deceased and in the ambulance.  He then entered the house and spoke to Cool, who pointed out a hypodermic needle on the living room floor.  Boeckh photographed it but did not collect it as evidence, then proceeded to the basement, where he took more photographs.  He then began collecting evidence, including various pieces of drug paraphernalia and items that he testified were used in the preparation and injection of heroin.  He also collected Kumm's cell phone, the data from which was subsequently extracted by Albert.  The data showed two phone numbers associated with a contact named "Durelle."  The investigation of this information led him to Oscar Torres and Torres' identification of defendant as the purchaser of the phone associated with one of those numbers.

¶ 20    Boeckh was involved with the execution of a search warrant at defendant's house on November 4, 2015, during which Boeckh took into evidence multiple cell phones.  He also photographed a gray Toyota Camry in the driveway.

¶ 21    After the execution of the warrant, Boeckh spoke with defendant at the Sheriff's office.  Defendant admitted that her phone number was the 773 area code number associated with the "Durelle" contact found on Kumm's phone.  She also denied having any other phones besides that number.  She stated that she had gotten a tattoo of a shamrock on the left side of her neck prior to 2010; the tattoo was still present.  She last saw Kumm in September 2015.  She stated that she was in Chicago on the day of Kumm's death and that Boeckh could check her I-Pass records for her 2012 Toyota Camry.  Those records showed three uses of the transponder on October 6, 2015, all from 8:14 p.m. or later.

¶ 22    On cross-examination, Boeckh stated that, on October 7, Cool told him over the phone that she had found "a hypodermic syringe with what appeared to be water inside of it" after the police had left and that she threw it away.  Boeckh did not go back to Cool's house to retrieve the syringe, and he had no idea what was in it.  He also admitted that various pieces of evidence, including a needle, pills, and capsules were never sent to the lab for analysis.

¶ 23    The data extracted from Kumm's phone showed text messages sent to five contacts between 5:34 and 5:36 p.m. on October 6 asking "Do u [*sic*] know where to get anything?"  Boeckh did not contact any of those people even though he had their phone numbers.  Boeckh described Kumm's bedroom as "tight quarters, extremely messy, drug paraphernalia everywhere."  There were "baggies everywhere, in the garbage."  He "tried to collect all of it" to the best of his ability.

¶ 24    On redirect examination, Boeckh testified regarding the text messages that Kumm sent to the other five contacts as she searched for drugs on October 6.  By 5:47, two of the contacts had

responded in the negative. One responded affirmatively, but Kumm had no further messages with him. Two others responded at 5:48 and 5:56, but Kumm told them that she had already found some. On the other hand, Boeckh detailed an extensive list of texts between Kumm and "Durelle" at about the same time, culminating with a text from "Durelle at 6:11 saying, "Come out im [*sic*] pullin [*sic*] up."

¶ 25    Sergeant Adam Boyce of the Marengo police department testified regarding the data extracted from Kumm's phone. There was a series of texts between Kumm and Artemio Gonzalez between 5:06 and 5:22 p.m. on October 6 relating to Kumm asking Artemio to pick her up at the Crystal Lake train station. He also noted a phone call from Artemio to Kumm at 7:20 p.m.

¶ 26    Boyce then testified about an extensive series of texts between Kumm and Smedley between 5:06 and 9:05 on October 6. The list contained a text from Kumm at 5:44 stating, "I got a ride i got $50 n im waiting on Durelle" and a text from Smedley at 9:04 that read, "Hows it a the house? Wat did u tell mom i went and did? How's Durelle's shit?"

¶ 27    Boyce stated that Kumm's phone contained a contact named "Durelle" that had two phone numbers associated with it. Calls and text messages between Kumm and "Durelle" began on September 30, 2015. Boyce testified as to the substance and sender of each text message. On October 6, 2015, texts between the two began at 10:57 a.m. Dozens of phone calls from Kumm's phone to Durelle's phone numbers were interspersed with the text messages; between 4:31 and 4:37 p.m., there were 16 calls or texts from Kumm's phone to Durelle's numbers, and 12 more between 4:48 and 5:19. At 5:29, Kumm's phone was used to text, "I have $50 n a ride can I come see u." At that point, the texts became responsive, with Durelle's phone texting, "Where u at?", Kumm's phone responding "Crystal Lake, and Durelle shortly thereafter responding, "Im comin to cl." Various texts regarding where Kumm was at ("those apartments off 176"), ("the slummy

apartments"), ("the ones with parkin in back") culminated in a 6:12 p.m. text from Durelle, "Come out im pullin up," to which Kumm's phone responded, "Ok." An unanswered call from Kumm's phone to Durelle one minute later was the last communication between the phones.

¶ 28    On cross-examination, Boyce stated that he had viewed surveillance video from a store in Crystal Lake showing Smedley in possession of Kumm's phone from approximately 12:45 p.m. to 2:00 p.m. on October 6, 2015. Boyce could not say with certainty who used the phone for texts or calls prior to 5:00 p.m. on that day.

¶ 29    Martin Skelcy, a forensic scientist for the Illinois State Police, testified that he analyzed either powder or residue obtained from various colored baggies and zip-top bags for the presence of controlled substances at the request of the Marengo Police Department. One pink baggie contained heroin and fentanyl. In three other pink baggies, he confirmed the presence of heroin but did not confirm the presence of fentanyl; since he had confirmed fentanyl in the first baggie, "it was not needed." Three zip-top bags tested positive for heroin but did not test positive for fentanyl.

¶ 30    Forensic toxicologist Kevin Shanks testified that Kumm's blood contained 6-monoacetylmorphine, a metabolite of heroin that can come about only by heroin consumption. If it is found in postmortem blood, it shows that heroin was consumed within the last two to three hours before death.

¶ 31    Forensic pathologist Dr. Mark Peters performed the autopsy on Kumm's body. Peters noted that the toxicology report on Kumm's blood showed the presence of both the pain medication fentanyl, at a level "extremely above therapeutic," and 6-monoacetylmorphine, indicating heroin use. Morphine, a further breakdown product of heroin, was also present in an amount more than six times higher than the therapeutic amount. However, morphine is not only a byproduct of heroin

use and can be ingested in other ways. Peters determined the cause of death to be "the adverse effects of heroin and fentanyl." The fentanyl alone (7 to 20 times above therapeutic level) could have caused Kumm's death. However, because of the high levels of morphine in her blood from the heroin, which also could have caused her death on its own, "the two together really could have caused her death and did." He could not say that heroin alone caused Kumm's death, although, had heroin been the only drug he had found in her system, "I still would have confidently said that she died of heroin."

¶ 32    After the trial court denied defendant's motion for a directed verdict, the defense rested without calling any witnesses. After the jury returned its guilty verdict, defendant filed a motion for a new trial, which the trial court denied. This appeal followed.

¶ 33                                   II. ANALYSIS

¶ 34    Defendant first contends that the trial court erred in denying her motion to suppress statements. According to defendant, her statements were taken in violation of the 5th Amendment because she had invoked her rights against self-incrimination and to have counsel present during a custodial interrogation. The review of a motion to suppress presents both questions of law and fact. *In re Christopher K.*, 217 Ill. 2d 348, 373 (2005). We will uphold on review a trial court's credibility determinations and findings of historical fact unless they are against the manifest weight of the evidence; however, the ultimate legal question of whether the evidence should be suppressed is reviewed *de novo*. *Id*.

¶ 35    Detective Boeckh testified at the hearing on defendant's motion that he interviewed defendant at the McHenry County Sheriff's office on November 4, 2015. Defendant was in custody on other charges and was not under arrest in this case. Boeckh told defendant that he was looking for information regarding Kumm. Defendant read and signed a Miranda form, which

included the statement that she could ask for an attorney at any time. During the interview, which was video and audio recorded, the following colloquy took place:

"BOECKH: Did she [Kumm] vent to you there when you met up with her?

DEFENDANT: I didn't meet her.

BOECKH: Well, I'm saying you did.

DEFENDANT: No, you're not.

BOECKH: Cause we—

DEFENDANT: Well then you can get me a lawyer because you can't tell me what I did if I know what I did. You—I have all missed calls from the girl, on the 6th. I already knew this s**t was coming today, they already said all this s**t. They said that her boyfriend said that I was in her—in his f***ing house in Marengo and left her foaming at the mouth. Her boyfriend—I don't know his f***ing name—but that's what they said—and if I left her foaming at the mouth then you guys should see at the Shell gas station I was nowhere f***ing near Marengo. At all. Nowhere near there. At all. At all. And that's all I hear. And I just tried to call you and get this s**t figured out."

The interview then continued for well over an hour.

¶ 36    Defendant first argues that she did not knowingly and intelligently waive her right against self-incrimination pursuant to *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). The State has the burden of proving that a confession was voluntary by a preponderance of the evidence. *People v. Braggs*, 209 Ill. 2d 492, 505 (2003). In this setting, the concept of voluntariness includes proof that the defendant made a knowing and intelligent waiver of her privilege against self-incrimination and her right to counsel. *Id.* The voluntariness of a confession involves the totality of the circumstances, including the defendant's age, intelligence, background, experience,

education, mental capacity, and physical condition at the time of questioning, along with the legality and duration of the detention. *Id*. We must also consider whether there was any physical or mental abuse, including if police made threats or promises to the defendant. *Id*. No single factor is dispositive. *Id*.

¶ 37    Defendant argues that she did not knowingly and intelligently waive her *Miranda* rights because, when her interrogation was initiated, "she was neither criminally charged nor informed of the subject matter of the questioning." Defendant cites no caselaw to support the proposition that these are prerequisites to a knowing and intelligent waiver of rights and makes no specific factual arguments as to how their alleged absence here made her waiver unknowing and unintelligent. As the trial court noted, "officers have no obligation to inform a defendant of the nature of the interview or that the defendant was the prime suspect in the investigation." In addition, it is clear that defendant knew of the reason for the interview. Within a minute and a half of entering the room, Boeckh told defendant that he wanted to talk to her about Kumm. Defendant did not appear surprised about the line of questioning, as she later stated, "I already knew this s\*\*t was coming today, they already said all this s\*\*t" and "I just tried to call you and get this s\*\*t figured out." Defendant has not adequately developed this argument, and it is also belied by the video evidence. We find no error here.

¶ 38    Defendant next argues that she unequivocally asserted her 5th Amendment Right to counsel and that Boeckh nevertheless continued his interrogation. "A suspect who expresses the desire to deal with police only through counsel is not subject to further interrogation until counsel has been made available, unless the suspect initiates further communication with the police." *In re Christopher K.*, 217 Ill. 2d 348, 376 (2005). The first question in determining whether statements obtained during custodial interrogation may be used against an accused is whether the accused

actually invoked his right to counsel; if so, the court must then consider whether the accused then initiated further conversation with the police so as to knowingly and intelligently waive his previously asserted right. *Id*. Determining whether a suspect actually invoked his right to counsel is an "objective inquiry;" "if a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect might be invoking the right to counsel," a police officer is not required to cease questioning. *Davis v. United States*, 512 U.S. 452, 458-59 (1994). A suspect "must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." *Id*. at 459. While it is a good police practice to clarify whether a suspect actually wants counsel, such clarification is not required. *Christopher K.*, 217 Ill. 2d at 379.

¶ 39    Here, the trial court ruled:

> "Here, Defendant did not unequivocally invoke her right to counsel or if her statement would be interpreted as such, the statement being, Well, you can get me a lawyer, could be construed as such, she immediately thereafter waives that right by engaging in a course of conduct inconsistent with the assertion of such a right. A review of the video shows that shortly after being given her Miranda warnings, the Defendant is confronted with a statement by Detective Boeckh that she wants to deny. Defendant begins arguing with the detective and states,
>
> Defendant: I didn't meet her.
>
> Detective: Well, I'm saying you did.
>
> Defendant: No, you are not.

Defendant: Okay.  Well, then you can get me a lawyer because you can't

tell me what I did if I know what I did.  I have all missed calls from the girl.

Defendant thereafter continues to argue with the officers and engage in

conversation and dialogue with them for approximately an hour thereafter.

Defendant at no time attempted to terminate the interview or refuse to answer

questions or unambiguously ask for an attorney."

¶ 40    Our review leads us to conclude that the trial court's findings were not against the manifest weight of the evidence.  Defendant continued to argue with Broeckh about the very issue with which they were involved when she mentioned a lawyer; defendant never stopped talking after referencing a lawyer.  This was not an unambiguous request or demand for a lawyer.  Even if defendant's statement was considered to actually invoke her right to counsel, she continued and initiated further conversation with the police and thereby knowingly and intelligently waived her previously asserted right.  We conclude that the trial court did not err in denying defendant's motion to suppress.

¶ 41    Defendant next contends that her right to due process was violated where investigators "with animus" toward her destroyed potentially exculpatory evidence.  The State notes that defendant failed to raise the issue in the trial court, either through an adverse inference instruction, an objection, a motion for sanctions, or as an issue in her posttrial motion.  Generally, a defendant forfeits ordinary appellate review of an error when she fails to object at trial and include the error in a posttrial motion. *People v. Johnson*, 238 Ill. 2d 478, 484 (2010).  We also note that defendant did not raise a plain-error argument in her initial brief in this court, only raising the argument in her reply brief.  According to Supreme Court Rule 341(h)(7) (eff. May 25, 2018), points not argued in the appellant's brief are waived and shall not be raised in the reply brief, in oral argument, or on

petition for rehearing. *People v. Polk*, 2014 IL App (1st) 122017, ¶ 49. Generally, in the absence of a plain-error argument by a defendant, we will honor the defendant's procedural default. See *People v. Ramsey*, 239 Ill. 2d 342, 412 (2010). However, our supreme court has determined that raising a plain-error argument in a reply brief is sufficient to allow us to review an issue for plain error. *Id.*

¶ 42    The plain error doctrine allows a reviewing court to consider unpreserved error when a clear or obvious error occurred and (1) the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant; or (2) the error is so serious that it affected the fairness of the defendant's trial and the integrity of the judicial process, regardless of the closeness of the evidence. *People v. Schroeder*, 2012 IL App (3d) 110240, ¶ 23. The first step in our plain-error analysis, then, is to determine whether a clear or obvious error occurred. *Ramsey*, 239 Ill. 2d at 412.

¶ 43    According to defendant, Boeckh and Boyce failed to collect one or more loaded syringes found at Cool's home during the investigation into Kumm's death. At trial, Boeckh was shown a photograph that showed, amongst other things, a hypodermic needle found in the basement of Cool's house. Boeckh testified that the syringe was not collected as evidence that day and was not tested for fingerprints or for controlled substances. Further, on October 7, Cool told Boeckh over the phone that she had found "a hypodermic syringe with what appeared to be water inside of it" after the police had left and that she threw it away. Boeckh did not go back to Cool's house to retrieve the syringe, and he had no idea what was in it. Other syringes and drug paraphernalia had been collected as evidence.

¶ 44    Defendant argues that the trial court plainly erred "when it failed to identify the due process violation intrinsic in the government's willful failure to preserve the evidence identified by Laurie

Cool." Our supreme court has adopted the analysis contained in *Arizona v. Youngblood*, 488 U.S. 51 (1988) to apply to cases involving the loss or destruction of evidence. See *People v. Sutherland*, 223 Ill. 2d 187, 235 (2006). Under this analysis, the failure to preserve potentially useful evidence does not constitute a denial of due process unless the defendant can show bad faith on the part of the police. *Id*. At 236. The existence of bad faith is dependent on the State's knowledge of the exculpatory value of the evidence at the time the evidence was lost or destroyed. *Id*. at 236-37. Neither mere negligence nor sloppiness is bad faith. *People v. Gentry*, 351 Ill. App. 3d 872, 878 (2004). Bad faith will not be found where the defendant offers nothing other than mere speculation to demonstrate bad faith. *Id*. at 237. However, official animus towards a defendant or a conscious effort to suppress exculpatory evidence can be considered evidence of bad faith. See *id*. at 879, citing to *People v. Trombetta*, 467 U.S. 479, 488 (1984).

¶ 45     Here, the evidence does not show bad faith. Boeckh had described the downstairs room where Kumm was found as "tight quarters, extremely messy, drug paraphernalia everywhere." He "tried to collect all of it as I could to the best of my ability." He testified that, "[b]esides that needle with the water, from what Laurie Cool thought was in it, and Brandon Smedley, that was actually the only item that I assumed I left behind."

¶ 46     Defendant offers nothing more than mere speculation, asserting that "[t]he loaded syringe evidence would have supported Defendant's arguments that [Kumm] obtained heroin from a source other than defendant" and "[s]uch evidence, if proved to come from a source other than Defendant, would have tended to prove defendant's innocence." Even assuming that the liquid in the syringe, described by Cool and Smedley as appearing as water, was heroin, it is unexplained how the source of that heroin could have been determined to be someone other than defendant. The police recovered multiple syringes, baggies, and other drug paraphernalia tied to the use of

heroin, and Kumm's death was tied to heroin use. While the best practice may have been to collect and test the syringe that Cool eventually found and threw out, we cannot conclude that the failure to find this evidence or to later collect this evidence was so clear and obvious that it was plain error. Thus, we grant no relief here.

¶ 47    Defendant next contends that the trial court erred in denying her proposed instruction No. 1 regarding causation and giving its own instruction to the jury. In general, we review an issue of whether the trial court erred in refusing a particular jury instruction under an abuse of discretion standard. *People v. Nere*, 2018 IL 122566, ¶ 29 (*Nere* II). However, the issue of whether a particular jury instruction accurately conveyed to the jury the law applicable to the case is reviewed *de novo*. *Id*.

¶ 48    Illinois Pattern Jury Instructions, Criminal, No. 7.15 (4th ed. 2000) (hereinafter IPI Criminal 4th No. 7.15 (Supp. 2011)), "Causation in Homicide Cases Excluding Felony Murder," provides:

"In order for you to find that the acts of the defendant caused the death of _____, the State must prove beyond a reasonable doubt that defendant's acts were a contributing cause of the death and that the death did not result from a cause unconnected with the defendant. However, it is not necessary that you find the acts of the defendant were the sole and immediate cause of death."

¶ 49    Defendant's instruction No. 1, which the trial court refused to give, was based on this court's decision in *People v. Nere*, 2017 IL App (2d) 114143 (*Nere* I), and it stated:

"In order for you to find the acts of the defendant caused the death of Chelsie Kumm, the State must prove beyond a reasonable doubt that but for the use of heroin delivered by the defendant the death of Chelsie Kumm would not have occurred."

Instead the court gave its own instruction No. 1, IPI No. 7.15 as modified by our decision in *Nere* I, which stated:

"In order for you to find that the acts of the defendant caused the death of Chelsie Kumm, the State must prove beyond a reasonable doubt that defendant's acts were an independently sufficient cause of the death and that the death did not result from a cause unconnected with the defendant. However, it is not necessary that you find the acts of the defendant were the sole and immediate cause of death."

¶ 50 Supreme Court Rule 451(a) (eff. Apr. 8, 2013) requires a trial court to instruct a jury pursuant to the IPI criminal instructions unless the trial court determines that the IPI instruction does not accurately state the law. See *People v. Hudson*, 222 Ill. 2d 392, 399-400 (2006). A trial court has discretion to allow non-IPI instructions that cover subjects that it determines the jury should be instructed upon; however, the tendering of such instructions is only proper if they are accurate, simple, brief, impartial, nonargumentative statements of the law. *People v. Bush*, 157 Ill. 2d 248, 254 (1993). Jury instructions should not be misleading or confusing. *Id.*

¶ 51 Defendant argues that the trial court erred "when it failed to adopt this Court's criticisms of IPI No. 7.15 in [*Nere* I] concerning its use of plural 'acts.' " According to defendant, the jury was "given no direction as to which 'acts' it should be concerned with" and could have been confused as to the uncharged conduct of delivery of fentanyl.

¶ 52 Jury instructions should be construed as a whole, not read in isolation. *Nere*, 2018 IL 122566, ¶ 67. This court must determine whether the instructions, taken as a whole, fully, fairly, and comprehensively apprised the jury of the relevant legal principles. *Id.* We find that, read as a whole, the jury instructions in this case did so instruct the jury. The jury was also instructed with IPI Criminal 4th No. 7.27 and 7.28, the definition and elements instructions for drug induced

homicide. In both of these instructions, the only act of the defendant mentioned was "knowingly delivers [or delivered, in No. 7.28] to another a substance containing heroin, a controlled substance." There can be no misunderstanding of what action of defendant the jury was to be concerned with, and no confusion between heroin and fentanyl. The trial court did not abuse its discretion in refusing defendant's proposed instruction, and no error in giving the court's instruction.

¶ 53    Defendant finally contends that the evidence admitted at trial was insufficient to prove her guilty beyond a reasonable doubt. "The due process clause of the fourteenth amendment to the United States Constitution safeguards an accused from conviction in state court except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime charged." *People v. Brown*, 2013 IL 114196, ¶ 48. When addressing a challenge to a criminal conviction based on insufficient evidence, this court must consider all of the evidence in the light most favorable to the prosecution and determine whether any rational trier of fact could have found beyond a reasonable doubt the essential elements of the crime. *Id*. "This standard of review 'gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.' " *Id*. quoting *Jackson v. Virginia*, 443 U.S. 307, 319, (1979). This court will not substitute its judgment for that of the trier of fact on issues involving the weight of the evidence or the credibility of the witnesses. *Id*. Although these determinations by the trier of fact are entitled to deference, they are not conclusive, and a criminal conviction will be reversed where the evidence is so unreasonable, improbable, or unsatisfactory as to justify a reasonable doubt of the defendant's guilt. *Id*.

¶ 54    Defendant was charged with drug induced homicide, in that:

"said defendant unlawfully delivered a substance containing heroin, a controlled substance, to another, in violation of Chapter 720, Section 570/401 and as a result of said delivery Chelsie Kumm's death was caused by the injection, inhalation, absorption or ingestion of any amount of that controlled substance, in violation of Chapter 720, Section 5/9-3.3(a) of the Illinois Compiled Statutes."

¶ 55    Defendant first argues that the State failed to prove beyond a reasonable doubt that defendant possessed heroin on October 6, 2015 and delivered it to Kumm.  Defendant isolates pieces of evidence and argues that, individually, the items of evidence fail to show possession or delivery.  For example, defendant argues that, while Deputy Novak testified that defendant had told him in 2011 that she had been dealing heroin for a year and Smedley testified that he and Kumm had purchased heroin from defendant five to seven times previously, this failed to show that defendant possessed any heroin on October 6, 2015.  She then asserts that the text messages entered into evidence did not specify that a heroin sale would take place at the meeting between Kumm and "Durelle."  Further, even the witnesses who placed defendant in the parking lot that night, Gilberto and Jose Martinez, "testified that they did not see Defendant transfer anything to [Kumm]."  Instead, according to defendant, the state required the jury to "use their imaginations" to find defendant guilty by telling the jury, "You know what's going on in that parking lot that night.  There is absolutely nothing else other than the sale of heroin that is going on in that parking lot that night."

¶ 56    As the jury was instructed, all the evidence in the case should be considered "in the light of your own observations and experience in life."  See IPI Criminal 4th No. 1.01 (Supp. 2011)).  Circumstantial evidence, "proof of facts or circumstances which give rise to a reasonable inference

of other facts which tend to show the guilt or innocence of the defendant," is to be considered by the jury. See IPI Criminal 4th No. 3.02 (Supp. 2011)).

¶ 57    Here, viewing all of the evidence in the light most favorable to the State, we conclude that the evidence was sufficient to sustain a finding that defendant delivered heroin to Kumm beyond a reasonable doubt. In addition to the circumstantial evidence listed above, Smedley testified that he and Kumm were both trying to obtain heroin that day, as Kumm was feeling ill from her lack of heroin. Kumm texted him that she "got $50" and was "waiting on durelle [*sic*]." He stated that the reference to $50 meant that Kumm was getting three bags of heroin, as defendant sold heroin for $20 a bag or 3 bags for $50. Kumm also texted him that she was "doing one at [ ] least," which Smedley took this to mean that Kumm was going to do at least one bag of heroin before he got back home. Her plan not to wait makes sense in light of the testimony regarding her withdrawal symptoms. At 9:04 p.m, on his way home, Smedley texted Kumm in part "How's Durelle's shit?" He never received a response. Smedley also testified that defendant sold heroin in pink or purple bags and was the only dealer that used such packaging. The police found full pink baggies of heroin in Kumm's room, and Smedley identified the bags as the type that defendant used. He also stated that those baggies were not in the house when he went out that day. Finding that defendant possessed and delivered heroin to Kumm did not require imagination.

¶ 58    Defendant then argues that the State did not prove the issue of causation beyond a reasonable doubt. According to defendant, the State was required to prove that the level of heroin in Kumm's body would, beyond a reasonable doubt, have killed her even in the absence of fentanyl.

¶ 59    Dr. Peters, who performed Kumm's autopsy, determined the cause of death to be "the adverse effects of heroin and fentanyl." Heroin use was shown by the presence of 6-

monoacetylmorphine in Kumm's blood. According to Kevin Shanks, the toxicologist, that metabolite of heroin can come about only by heroin consumption, and its presence shows that heroin was consumed within the last two to three hours before death. Both fentanyl and morphine, a further breakdown product of heroin, were present in amounts well above therapeutic levels. According to Peters, while the fentanyl alone or the high level of morphine from the heroin could each have caused Kumm's death on its own, "the two together really could have caused her death and did." While he could not say that heroin alone caused Kumm's death, had heroin been the only drug he had found in her system, "I still would have confidently said that she died of heroin."

¶ 60    Defendant relies on this court's decision in *Nere* I and *Burrage v. United States*, 571 U.S. 204 (2014) to argue that the evidence does not prove that heroin was an independently sufficient cause of death apart from the fentanyl." However, Illinois does not follow the "independently sufficient cause of death" standard but applies, instead, the "contributing cause" approach. Defendant fails to address our supreme court's analysis in *Nere* II, which specifically declined to follow *dictum* contained in *Burrage* and this court's decision in *Nere* I and concluded:

> "This court has defined criminal causation in terms of a contributing cause standard for over a century. Nothing in *Burrage* requires us to abandon that standard, and nothing in *Burrage* convinces us that we should abandon that standard. We appreciate the appellate court's concerns and in-depth analysis of this issue [in *Nere* I], but we disagree with its conclusion that we should replace the contributing cause standard with a 'but-for' requirement." *Nere*, 2018 IL 122566, ¶64.

¶ 61    Thus, defendant's argument is not well taken, as it applies the wrong standard of causation. We find no error in the jury's finding of guilt beyond a reasonable doubt.

¶ 62                                    III. CONCLUSION

¶ 63    For these reasons, the judgment of the circuit court of McHenry County is affirmed.

¶ 64    Affirmed.